[Civ. No. 19289. Second Dist., Div. One. Mar. 9, 1953.]

KATHERINE M. BACHENHEIMER, Appellant, v. PALM SPRINGS MANAGEMENT CORPORATION (a Corporation) et al., Respondents.

582

Alvin P. Jackson and Martin Goldman for Appellant.

David H. Cannon and Reed Callister for Respondents.

PATROSSO, J. pro tem.—Plaintiff instituted this action to rescind certain agreements executed between herself and the defendants which are hereinafter described and to recover all monies paid by her thereunder. Her complaint sought relief upon three grounds: (1) that the execution of the agreements in question was procured by the fraud of the defendants; (2) that the agreements constitute ''securities'' within the meaning of the Corporate Securities Act and hence are void because the sale and issuance thereof was not authorized by a permit of the Commissioner of Corporations, and (3) that they are violative of the provisions of the Business and Professions Code regulating the sale and leasing of subdivided lands. The trial court's findings were adverse to the plaintiff upon all issues. Plaintiff however makes no attempt to challenge the sufficiency of the evidence to sustain the finding against her upon the issue of fraud and hence no consideration thereof is required.

At all the times herein mentioned the respondent corporation has been the owner of a parcel of real property situate in the city of Palm Springs approximately 270 feet square. Prior to the time when the agreements hereinafter mentioned were executed the property was unimproved. However, the corporation had theretofore filed with the Building Department of the city of Palm Springs a plot plan of this property which was designated thereon as ''Bonaire Village.'' On this plot plan there are delineated separate rectangles, consecutively numbered, which in the agreements hereinafter mentioned are referred to as ''building units,'' a parking area, walks and a swimming pool. What purports to be a photographic copy of this plot plan appears upon the reverse side of the lease agreements hereinafter mentioned. While no notation appears thereon as to the scale of the drawing, the exterior dimensions of the property are noted thereon, and, applying the scale to be derived therefrom, each of the ''building units'' appears to be of the dimensions of 30' x 20' The filing of this plot plan with the Building Department was preliminary to the execution of the plan of the respondent corporation to divide and improve the property in the manner therein designated, and to construct upon

the "building units" bungalows of the character mentioned and described in the agreements now to be mentioned.

In July, 1948, appellant and respondent corporation executed two agreements, identical in terms except for the description of the "building unit" covered thereby, entitled "Lease Agreement" wherein the respondent corporation is designated as "Lessor" and appellant is designated as "Lessee," the terms of which may be summarized as follows:

"Lessor leases and lets to Lessee for the term of ninety-nine (99) years from this date (July 9 and 14, 1948, respectively) building unit marked No. 10 (25) as shown on the plot plan appearing on the reverse side of this Lease, which plot plan is known as 'Bonaire Village' on file with the Building Department of the City of Palm Springs, Riverside County, State of California, located on that parcel of real estate more particularly described as follows:" after which is set forth a description of the entire parcel of real property to which reference has previously been made and to which we will hereinafter refer by the designation given it by respondents, namely "Bonaire Village." Lessee agrees to pay Lessor the sum of $7,500 as follows: $500 in cash, $1,000 upon demand within 30 days and the balance in monthly payments of $80, including interest at 6 per cent per annum, beginning September 1, 1948. Lessor may cancel the lease "upon the failure of Lessee to meet his obligations imposed hereunder" and in the event thereof all monies theretofore paid by the lessee shall be retained by lessor "and shall constitute rental for the use and occupancy of the *leased premises* up to that time, and lessor shall have the right to re-enter and take possession of said *leased premises*." Lessor shall within a period of 30 days begin to construct and thereafter diligently prosecute to completion "the construction of a *building* with the elevations, floor plan, dimensions and general specifications set out on the reverse side hereof, and will begin and diligently prosecute to completion the work necessary to landscape the entire *block* shown therein by planting shrubbery and lawns and by installing walks, driveways and a swimming pool." Turning to the reverse side of the agreement we find a perspective drawing of the building to be constructed by lessor together with floor plan thereof showing a building having the exterior dimensions of 28' x 18', which is to be of "frame and stucco construction, concrete slab floor, and Tropicool roof, to meet all requirements of City and State building codes."

Continuing, the lease agreement provides that if, for reasons beyond the control of the lessor, it is unable to deliver the *building* within five months, lessor shall refund all monies theretofore paid by lessee and "lessee agrees to relinquish all documents and execute any further documents *quitclaiming back to lessor any rights, title and interest under this lease which may have been acquired and recorded by said lessee.*" The lease shall be binding upon the heirs, administrators, executors and assigns of the parties, and while the lessee may assign the lease, any such assignment "shall be made only to persons of the white or caucasian race," and "no persons of any other race shall occupy or use the said *leased premises* except as domestic servants." The lessee "shall have the right without cost to use the various walks, driveways, and the swimming pool . . . while this lease is in good standing," and lessor agrees to maintain the same, furnishing necessary water for the lawns, shrubbery and swimming pool "*and to pay all real estate taxes assessed or assessable against the entire parcel embracing the leased premises;*" lessee, however, agreeing to pay "to said lessor his proportionate 1/38 share of said money so expended by the lessor for the above items." "Lessor agrees to arrange for the furnishing of electric energy, domestic water and gas for the *building* referred to in the said lease and to furnish maid and laundry service as may be desired by lessee," for all of which the latter agrees to pay. The two final paragraphs of the agreement read as follows:

"10. That the *building* to be constructed for the lessee by lessor herein shall be considered the personal property of the lessee herein upon the payment in full of the amount of money as indicated on line 2, paragraph 2 herein ($7,-500.00), and a bill of sale to said personal property shall be given to said lessee by the said lessor without lien or encumbrance."

"11. That when lessee has paid the amount of money set out on line 2, Paragraph 2 herein as payment in full, lessor will within sixty (60) days thereafter cause this lease to be acknowledged in order that it may be recorded in the records of Riverside County, State of California, by the lessee herein." (Emphasis throughout is our own.)

At or about the same time as the execution of the lease agreements the parties entered into a "Property Management Agreement" whereby the respondent corporation agreed to care for, manage and operate the "building units," the

manager being constituted the sole and exclusive agent to rent the building at such times as the owner desired to rent the same to other persons, for which the manager was to receive a compensation of 20 per cent of the rental received. The Property Management Agreement covering unit No. 10 was to continue for a period of one year from December 1, 1948, and that covering Unit No. 25 was to continue until June 30, 1950. At the same time appellant purchased from the respondent corporation furniture and furnishings for the buildings for the price of $3,653.24, on account of which she paid $1,173.24, and executed a Conditional Sales Contract for the balance to the respondent, Clarke.

We have set forth the terms of the lease agreements in some detail because the provisions thereof are necessary to proper understanding of the questions presented upon the appeal.

We direct our attention first to the question as to whether the lease agreements in question fall within the purview of the statute regulating the sale and leasing of subdivided lands, for in our view it is decisive of the controversy. The particular provisions of the Business and Professions Code with which we are concerned are sections 11000 and 11010 which, insofar as material here, read as follows:

"11000. 'Subdivided lands' and 'subdivisions' refer to improved or unimproved land or lands divided or proposed to be divided for the purpose of sale or lease, whether immediate or future, into five or more lots or parcels. . . ."

"11010. Notice of intention to sell subdivided lands. (When and by whom notice to be given.) Prior to the time when subdivided lands are to be offered for sale or lease, the owner, his agent or subdivider shall notify the commissioner in writing of his intention to sell such offering.

" (Contents.) The notice of intention shall contain the following information:

(a) The name and address of the owner.

(b) The name and address of the subdivider.

(c) The legal description and area of lands.

(d) A true statement of the condition of the title to the land, particularly including all encumbrances thereon.

(e) A true statement of the terms and conditions on which it is intended to dispose of the land, together with copies of any contracts intended to be used.

(f) A true statement of the provisions, if any, that have been made for public utilities in the proposed subdivision, including water, electricity, gas and telephone facilities.

(g) Such other information as the owner, his agent, or subdivider, may desire to present.''

Failure to comply with the provisions of the last quoted section is denounced as a public offense punishable by imprisonment in the county jail for a term of not to exceed two years or by a fine of not to exceed $2,000 (Bus. & Prof. Code, § 11020). It may be noted in passing that the foregoing are a codification of substantially similar provisions of an earlier statute, the constitutionality of which was upheld in *In re Sidebotham,* 12 Cal.2d 434 [85 P.2d 453, 122 A.L.R. 496].

Admittedly respondent corporation did not comply with the provisions of section 11010, and hence if the lease agreements executed by it with appellant are comprehended by the provisions of section 11000, they are illegal and void. We entertain no doubt that Bonaire Village constitutes ''subdivided lands'' within the meaning of the statute quoted above, for a mere reference to the plot plan filed by the respondent corporation with the Building Department of the city of Palm Springs discloses a tract of land which is divided into more than five parcels, namely 38 separate areas, to which access is afforded by means of designated walks and driveways. The fact that these are designated in the agreements in question as ''building units'' and not as ''lots'' is of no significance. As used in the statute the word ''lot'' applies to any portion, piece, or division of land and is not limited to parcels of land laid out into blocks and lots regularly numbered and platted. (See *Westbrook* v. *Rhodes,* 92 Okla. 149 [218 P. 873, 875]; *Cowell* v. *Clark,* 37 Cal.App.2d 255, 258 [99 P.2d 594]; *People* v. *Gallinger* 37 Cal.App.2d 261, 262 [99 P.2d 597].) While the separate areas or parcels delineated upon the plot plan are not designated thereon as ''lots'' the entire parcel is referred to in the lease agreement as ''the block,'' and the ''units'' into which it is divided unquestionably constitute ''parcels'' within the meaning of that term as used in the statute. Moreover, it is too clear to admit of argument that, as disclosed by the agreements executed between the parties, the respondent corporation dealt with each ''unit'' as a separate parcel, and the testimony of Mr. Clarke, president of the respondent corporation, is to the effect that from the inception of the project the corporation intended to deal in a similar manner with more than one-half of the 38 ''units.''

Respondents, however, contend that the statute is not

applicable because, so it is said, respondents did not, by the terms of the agreements in question, lease any *land* but only "a bungalow—which is by express written agreement of the parties to be regarded as personal property only." Conceding for the moment that each of the agreements constitutes a lease of a bungalow (a question to be hereinafter discussed), it by no means follows, as respondents assume, that this compels the conclusion that they do not constitute leases of real property. The very converse is true, for since the days of Lord Coke it has been recognized that the lease of an entire house or building operates as a lease of the land upon which it stands. (*McMillan* v. *Solomon*, 42 Ala. 356, 358 [94 Am. Dec. 654].)

"The general rule is that the lease of an entire building *co nomine* is a lease of the land on which the building stands, at least as far as needed for its support, and adjacent land belonging to the lessor which is used with the building as necessary to its proper occupation for the purpose for which it was intended. . . . Where the lease is of the 'premises' with no qualifying words, it is generally held that 'premises' means land and buildings thereon." (51 C.J.S. 944.)

The statements in the foregoing text will be found abundantly supported by the authorities. (*Buckhorn Plaster Co.* v. *Consolidated Plaster Co.*, 47 Colo. 516 [108 P. 27, 33]; *Crabtree* v. *Miller*, 194 Mass. 123 [80 N.E. 225, 226]; *Szulerecki* v. *Oppenheimer*, 283 Ill. 525 [119 N.E. 643, 645]; *Brager* v. *Bigham*, 127 Md. 148 [96 A. 277, 279]; *Hooper* v. *Farnsworth*, 128 Mass. 487, 488; *Bacon* v. *Bowdoin*, 22 Pick. (Mass.) 401, 406; *Sherman* v. *Williams*, 113 Mass. 481, 484 [18 Am.Rep. 522]; *Lanpher* v. *Glenn*, 37 Minn. 4 [33 N.W. 10, 11]; *Wheeler* v. *McIntyre*, 55 Mont. 295 [175 P. 892, 894]; *Nashville, Etc. Ry. Co.* v. *Heikens*, 112 Tenn. 378 [79 S.W. 1038, 1040, 65 L.R.A. 298]; *Gainer* v. *Griffith*, 76 W.Va. 426 [85 S.E. 713, 714]; *Bussman* v. *Ganster*, 72 Pa. 285.)

In *Bacon* v. *Bowdoin, supra,* the court at page 405 says: "It is objected, that the land was not demised, but the buildings only, and that the plaintiff has only an easement in the land. . . . But by the demise of the building, the land on which it stood clearly passed as incident to the demise. The exclusive possession of the land was necessary to the enjoyment of the demise."

And the rule above stated is the same whether the building demised be in existence at the time of the lease or is to be constructed in the future. In *Bussman* v. *Ganster,*

*supra,* the court says (p. 290): "By the agreement in suit, Ganster agreed as party of one part with Bussman, Rahe & Company as parties of the second part, to erect a store-house in front of his own house, on the Negley lot in East Liberty, and to furnish the same with counters, shelving and other fixtures, to be ready by the 1st of August 1868, or as much sooner as practicable, at the rate of $600 until the 1st of April 1869, and thereafter, for the term of five years, at the rate of $800 per annum. It is true that there are here no formal words of demise, but it is very manifest that after the erection of the building there was created a term of years in the premises with a certain commencement and a certain termination; in short, with all of the requisites of a demise. Ought there to be any doubt that if this was a demise of the buildings when erected it was also a demise of the ground upon which it stood?"

And at page 289 the court says: "That the agreement in question was a lease of the land as well as of the building thereon, we think is very manifest."

We need not, however, rest our determination upon the foregoing alone, for a reading of the lease agreement renders inadmissible the contention of respondents that it constitutes nothing more than a lease of a house. Indeed, in the true sense of the word, it is not a lease of a house at all. ■ As is said in *Pringle* v. *Canfield,* 19 S.D. 506 [104 N.W. 223]: "(W)here title to specific personal property is to pass to the person taking possession thereof upon the completion of stipulated payments, together with interest and attorney's fees for collecting the amount in case of default, the term 'lease' is a misnomer, and the transaction a conditional sale, in exact accordance with the intention of the parties. Authorities are abundant in support of the suggestion that a transaction, by whatever name, is a conditional sale whenever payment is a prerequisite to the passing of title, and contracts framed to partake more of the qualities of a lease than the one before us have been so construed. . . ." (See, also, *Lundy Furn. Co.* v. *White,* 128 Cal. 170, 172 [60 P. 759, 79 Am.St.Rep. 41].)

■■ The agreements here have a dual character: (1) a contract whereby lessor agrees to construct and sell to lessee a bungalow and which lessee agrees to purchase for the specified price payable at the times and in the manner therein set forth, with title to remain in the lessor until the full purchase price of $7,500 is paid—a conditional sales contract, and (2) the grant by lessor to lessee of the right to occupy the

site or parcel of real property therein described and upon which the bungalow is to be erected for a definite term of 99 years. It is in the latter aspect alone that the agreement answers to the legal description of a lease. The subject matter of the contract of sale is the bungalow; that of the lease the parcel of real property therein described by reference to the plot plan showing its situs and dimensions. While the lease is to continue for a period of 99 years, the bungalow is to become the absolute property of the lessee ''without lien or encumbrance'' upon the payment of the agreed price of $7,500, which (in accordance with our hasty computation) is fully payable under the terms of the agreement in not to exceed nine years at the very latest. From and after the time that title to the bungalow vests in the purchaser it may not with reason be said that the latter is the lessee of the house of which he is the absolute owner free of ''lien or encumbrance.'' There is nothing in the agreement to suggest that the lessee may not remove the house from the premises after it has been fully paid for, and respondents concede that she may freely do so. It is equally clear that the removal of the house would not operate to terminate the rights of the lessee in and to the building site or release her from the obligations under the lease for the balance of the 99-year term, for it is expressly provided that the lessee shall, *for the full term,* pay 1/38 of respondent corporation's cost of maintaining ''the grounds, walks, driveways, and swimming pool,'' including the necessary water required therefor, as well as, ''all real estate taxes assessed or assessable against the entire parcel embracing the leased premises.'' Of necessity there must be some consideration for lessee's continuing promise to make these payments. And lessee's obligation in this regard cannot be relegated to the purchase of the bungalow, for the *total price* therefor is fixed at $7,500. Neither may it be considered as a charge for the right to use the bungalow after it is fully paid for (an event which must necessarily occur long prior to the expiration of 99 years) for it is then the sole property of the lessee. It becomes evident therefore that the obligations thus laid upon the lessee can only be in the nature of a charge or rent for the right to use and occupy the site upon which the building is erected without regard to whether it remains thereon for the full term or not.

Indeed, although perhaps unwittingly, counsel for respondents concede this to be true for in their brief they say: ''Those obligations (maintenance costs and taxes) assumed by the

lessee are part of the price of the *lease.*'' And again it is said: ''Of course, it is possible that the lessee will pay for the bungalow and get a bill of sale to it as provided in paragraph 10 of the Lease Agreement long before the expiration of the 99-year period but the obligation to pay 1/38 of the maintenance cost and of the taxes, etc., *is still a continuing obligation.* The plaintiff's ownership of the bungalow would not end at the expiration of the 99 years but *her right to keep it on the land* as personal property would end at that time, the same as a person's right to sever from the real estate the leased neon sign at the expiration of his lease on the building.'' (Emphasis added.)

██ To admit, as they do, that by the agreements under consideration appellant was granted and acquired, the ''right to keep it (the bungalow) on the land'' for a period of 99 years is necessarily to concede that the agreement constitutes a lease of the land upon which it is erected, for a lease is nothing other than an instrument by which one is granted, upon stated terms and conditions, *the right to occupy a parcel of land to the exclusion of the grantor.* (*Morris* v. *Iden,* 23 Cal.App. 388, 393 [138 P. 120]; *Williams* v. *Miller,* 68 Cal. 290, 293 [9 P. 166]; Tiedeman, Real Property, § 538; *Howard* v. *Manning,* 79 Okla. 165 [192 P. 358, 360, 12 A.L.R. 819, 821].)

██ While in the foregoing discussion we have undertaken to point out that lessee's obligation to pay a proportionate part of the maintenance cost of and taxes upon the entire tract of land of which the ''leased premises'' are a part, answers to the description of rent, it may be noted that reservation of rent is not an essential requirement of a lease. (*Barnett* v. *Lincoln,* 162 Wash. 613 [299 P. 392, 394]; *Willcox* v. *Bostick,* 57 S.C. 151 [35 S.E. 496, 497].)

██ Moreover, as is made evident by a cursory reading of the agreements, the word ''building'' is used therein in contradistinction to the term ''leased premises.'' The property demised (''leased premises'') is a ''building unit'' designated by number and reference to the copy of the plot plan appearing upon the reverse side of the agreements whereon it is delineated as a specific parcel of real property. Although not expressly so stated in the agreements, it is implicit therein that the ''building'' is to be constructed upon the particular parcel thus designated as constituting the ''leased premises.'' The ''building'' becomes the sole property of the ''lessee'' upon payment of the purchase price thereof but the ''leased

premises'' (the building unit) never became her property; lessee's sole right with respect thereto being to use and occupy the same to the exclusion of the owner (lessor) for the term of the lease unless sooner terminated by reason of her default in the performance of her obligations thereunder. ▇ Significant also is the provision whereby lessee is obligated to pay 1/38 of the "real estate taxes" assessed "against the *entire parcel embracing the leased premises.*'' The expression ''leased premises'' as used in this connection cannot reasonably be construed as referring to the bungalow alone, not only because, as previously noted, it is not leased, but also because, being personal property (as respondents themselves strenuously insist), it may not be said to be embraced by "the entire parcel" of real property constituting Bonaire Village. As employed here the meaning of the word "embrace" would appear to be "to include as parts of a whole" (Webster's New Intl. Dict., 2d ed.). ▇ While the property demised, the "building unit"—a parcel of real property—is undoubtedly embraced by the larger tract of which it forms a part, the bungalow (personal property) is no more embraced thereby or a part thereof than is the furniture and furnishings located therein. If upon any theory, however, it may be said that the term "leased premises" as used in the provision of the agreements in question comprehends the bungalow alone, it would necessarily follow that upon its removal by the lessee after it was fully paid for she would thereupon be released from the obligations thereby imposed of paying her proportionate share of the maintenance cost and real estate taxes; yet, as we have seen, counsel for respondents contend to the contrary. Nothing, we believe, more clearly demonstrates the unsoundness of their contention that the agreement in question constitutes nothing other than a lease of a bungalow.

We confess our inability to perceive the relevancy of the discussion in respondents' brief whereby they seemingly labor the point that leases are chattels real—personalty and not realty. (Civ. Code, § 765.) ▇ No one, of course, would undertake to dispute this elementary proposition but, while leaseholds are thus classified, they are nonetheless *estates in real property.* (Civ. Code, § 761; *Callahan* v. *Martin*, 3 Cal. 2d 110, 118 [43 P.2d 788, 101 A.L.R. 871]; *People* v. *Gallinger, supra*; 37 Cal.App.2d 261, 262.) A 99-year lease no less than one for a term of one year is personalty—a chattel real, but each is a "lease of land." Inasmuch as the statute under

consideration expressly includes *leases* of subdivided land, it is of no moment that such leases are, in law, regarded as a class of personal property rather than realty.

We have no doubt that the draftsman of the lease agreement, for reasons not too difficult to discern, strove valiantly to bring forth a document which, in legal effect, would operate as an agreement for the erection and sale of a bungalow with the right in the purchaser (for a consideration independent of the price to be paid for the building) to maintain the same upon a designated parcel of real property for 99 years, and yet would not, in contemplation of law, constitute a lease of the land upon which it was to stand for this prolonged period. His efforts, however, proved unavailing for inevitably the result of his labors was precisely that which he so studiously sought to avoid. Looking through form to substance, we experience no difficulty in ascertaining its true character, namely, that which in fact was intended and understood by both parties—a lease of real property for a term of 99 years.

Respondents having failed to comply with the provisions of the statute referred to, all of the agreements (five in number) are illegal and void, and appellant is entitled to recover the monies paid by her under all of such illegal and void agreements. (*Murphy* v. *San Gabriel Mfg. Co.*, 99 Cal. App.2d 365, 368 [222 P.2d 85].) This makes unnecessary the consideration of appellant's further contention that the agreements constitute securities within the meaning of the Corporate Securities Act.

The judgment is reversed and the cause remanded with directions to the court below to ascertain the amount of monies paid by appellant to respondents under all five of the aforesaid agreements in issue, and thereupon to render judgment in favor of appellant for such amount, with interest thereon from May 25, 1949.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied March 31, 1953.