RICHARD E. BOESEL, JR., AND VIRGINIA N. BOESEL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1548-73.    Filed November 24, 1975.

---

*John H. Convery,* for the petitioners.
*James H. Ross, Jr.,* for the respondent.

OPINION

DAWSON, *Chief Judge:* Respondent determined a deficiency of $6,881 in petitioners' Federal income tax for the year 1968.

Petitioners have made one concession. At issue is whether the discounted present value of future lease payments should be included in computing petitioners' cost of purchasing their new residence for the purpose of applying the nonrecognition of gain provisions of section 1034, I.R.C. 1954.[1]

All of the facts are stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The pertinent facts are summarized below.

Richard E. Boesel, Jr., and Virginia N. Boesel (herein called petitioners) are husband and wife whose legal residence was Belvedere, Calif., when they filed their petition in this proceeding. They filed their joint Federal income tax return for 1968 with the Internal Revenue Service Center at Ogden, Utah.

In September 1968, Richard E. Boesel, Jr., was transferred by his employer from its New York office to its San Francisco office. As a result of this transfer, the petitioners sold their residence located in Greenwich, Conn., on August 13, 1968, at an adjusted sales price of $162,307. Petitioners realized an estimated net gain of $103,589 on the sale of this residence, which was computed as follows:

| | |
|---|---|
| Net sales price of Connecticut home | $163,589 |
| Less: "Estimated" cost basis | (60,000) |
| Gain | 103,589 |

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

On August 20, 1968, the petitioners purchased from H. Morgan Noble and Cherry K. Noble a dwelling for use as a personal residence in Belvedere, Calif. This dwelling, exclusive of the land upon which it is situated, will hereinafter be referred to as "the new residence." In the escrow statement dated August 20, 1968, the purchase price of the new residence was computed as follows:

| | | |
|---|---:|---:|
| Purchase price | | $132,000 |
| Title insurance policy | $645 | |
| Notary fee, recording, and termite inspection | 35 | 680 |
| Total cost | | 132,680 |
| Less credit from broker | | (1,500) |
| Net cost or purchase price of Belvedere home per escrow statement | | 131,180 |

To the above purchase price the petitioners added improvement costs of $7,042 resulting in a total cost of $138,222 for the replacement residence in California.

The Belvedere residence is situated on land leased for $1,500 per year for a term of 75 years pursuant to a contract executed by and between West Shore Co., a partnership, lessor, and H. Morgan Noble and Cherry K. Noble, lessee, on February 26, 1965. Absent an extension of time granted for any of several express delays beyond the lessee's control, provision 5 [2] of the lease required the lessee to commence and complete construction of a single family dwelling on the leased property within 48 months after the commencement of the lease term or suffer termination of the leasehold interest at the lessor's option. Although this residence became the exclusive property in fee simple of H. Morgan and Cherry K. Noble after its timely con-

---

[2] 5. *Improvements.* As a condition to the continuance of any of the rights of Lessee hereunder, Lessee, within thirty-six (36) months after the date of commencement of the lease term, shall commence, and within forty-eight (48) months after the date of commencement of the lease term shall complete the construction on the leased land of a single family dwelling with all necessary fixtures; provided however, that said periods shall be extended by the time of any delay due to acts of God, public enemy, government, strikes, fire or unusually severe weather. In the event the construction of said dwelling shall not be commenced or completed, as the case may be, within the period prescribed therefor, Lessor at its option, may terminate this lease as herein provided. All improvements on the leased land shall be constructed and completed without any cost to or liability of Lessor. No improvements on the leased land shall be transferred or assigned, except with the transfer or assignment of the whole of Lessee's interest under this lease.

struction, it entered into a very close relationship with the leased land for the duration of the leasehold estate by virtue of three other unequivocal terms of the lease.

The last sentence in provision 5 dictates that "No improvements on the leased land shall be transferred or assigned, except with the transfer or assignment of the whole of Lessee's interest under this lease." Thus, the owner in fee simple of the completed dwelling and the lessee of the land must have the same identity. In addition, provision 19 of the lease states in part that:

At any time within ninety (90) days prior to the expiration of this lease, on condition that Lessee shall not then be in default under any of the covenants and conditions hereof, Lessee shall have the right to remove all improvements from the leased land at the sole cost and expense of Lessee.

Provision 19 thereby insures that the dwelling required to be built as a condition of the lease term's continuance will not be separated from the land subject to the lease for the duration of the estate.

Further evidence of this intimate relationship is found in provision 8 [3] which permits the lessee, upon the destruction of the dwelling, to either rebuild or terminate the lease, pay all outstanding liens and encumbrances, and clean up the land for return to the lessor. Regardless of which election is made, the dwelling and land are treated alike. If the dwelling is either repaired or rebuilt, their coexistence continues; but if lessee elects to withdraw, the building and leasehold estate disappear. Neither may continue to exist in the other's absence.

---

[3] 8. *Restoration of Improvements.* If during the lease term any improvements upon the leased land, or any part thereof, shall be damaged or destroyed by fire or any other casualty, Lessee, at his cost and expense, shall repair or replace the same or substitute another therefor. Such repair or replacement shall be commenced within sixty (60) days after such damage or destruction and shall be completed within twelve (12) months after such damage or destruction. Such substitution shall be in accordance with and subject to the requirements of paragraph 5, but the periods of time therein mentioned shall commence from the date of such damage or destruction. All insurance proceeds collected as a result of such damage or destruction, or such portion thereof as may be required for the same, shall be applied to the cost of such repair, replacement or substitution. Provided, however, that with the written consent of the holders of all encumbrances upon the leasehold interest Lessee may elect not to repair or replace a damaged or destroyed improvement and to terminate this lease upon payment to Lessor within ninety (90) days after such damage or destruction, of the amount of all unpaid taxes and installments of assessments with respect to the current and prior years then a lien upon the leased land and a sum equal to the rent then payable hereunder for the remainder of said term, but not to exceed a period of two years. In the event Lessee so elects to terminate this lease, he shall remove from the leased land the damaged or destroyed improvements and all debris, at his sole cost and expense within ninety (90) days after giving Lessor notice of such election.
* * *

Pursuant to the mandate of provision 5, the original lessees, H. Morgan Noble and Cherry K. Noble, assigned their leasehold interest to petitioners and recorded that act in the County Recorder's Office, Marin County, Calif., on August 20, 1968.

The ground lease assumed by petitioners provides that they shall pay all taxes and assessments on the land during the lease term and that the land is to remain free from all mechanics' or materialmen's liens. Liability for harm to persons or property on the land accrues solely to the lessee. The lessee may encumber the property by mortgage, deed of trust, or other security instrument in order to build on the land subject to the lessor's primary title to the land. A security holder may, upon lessee's default, elect to take over the lessee's obligations. Assignment of rights by the lessee is permitted with the lessor's consent. Without such consent, however, any attempted assignment by the lessee, except by devise or by will, will result in termination of the lease at the lessor's option. Nonetheless the lessee has an unrestricted right to lease the land in conjunction with any lease of improvements thereon. A security deposit of $1,500 was made, to be repaid upon termination of the lease or retained as the last year's "rent." If the leased land is taken by eminent domain, the lease terminates and any award is to be divided between the lessor (for land value) and the lessee (for value of improvements thereon). Improvements remaining on the land at the expiration of the lease term become the property of the lessor without compensation. Default by the lessee empowers the lessor to end the leasehold, or relet the land and lease, or sell the improvements for the lessee's account. Arbitration over disputes is available to both parties.

When computing the nonrecognized gain on the sale of the Connecticut residence, petitioners added to the $138,222 cost of the replacement residence in Belvedere the amount of $29,148, which purported to represent the discounted present value in 1968 of the future payments on a remaining 73-year lease at $1,500 per year. As a result, they reported no gain on the sale of the Connecticut residence on their 1968 Federal income tax return.

In his notice of deficiency dated December 15, 1972, respondent determined that petitioners realized a long-term capital gain of $25,367 on the sale of their personal residence in Greenwich, Conn., for the following reasons:

Since the present value of lease payments for land on which the new residence is located does not represent a liability on property acquired and since the present value of lease payments does not measure the amount of indebtedness attached to the interest in the property acquired, such present value cannot be included as part of the purchase price. * * *

Petitioners contend that a lease with an unexpired term of 73 years is the economic equivalent of a fee in such property. Such equivalency is recognized under other sections of the Code, e.g., section 1031 and section 1.1031(a)-1(c), Income Tax Regs., pertaining to exchanges of property held for productive use or investment. They assert further that in economic reality an owner of a house situate on leased land for a remaining term of 73 years would treat the property exactly as if it were his own and conclude that their investment in such a "fee" equivalent qualifies under section 1034 as part of the cost of purchasing their new residence.

Petitioners urge that the cost basis of property equals initial outlay plus any liabilities assumed to protect the investment. Thus, they claim to have made an investment in excess of $138,000 to acquire a residence and incurred an additional liability in the amount of the present value of the lease payments to protect their investment. Their argument is founded on the fact that if they fail to make these lease payments, the lessor has the right under their lease to remove them from the premises and thus deprive them of their $138,222 investment.

Petitioners equate their obligation to make future lease payments with any other debt payable in installments, e.g., a mortgage, whereby continued payments are required to retain the underlying asset. In signing the lease, petitioners allegedly assumed the liability to make periodic lease payments in order to protect their investment in both the land and the building, which together constituted their new residence. They assert that in liberalizing the treatment previously accorded the taxation of gains from the sale of personal residences, Congress obviously intended that the purchase price of a replacement residence would include the supporting "real estate." Moreover, it is urged that the term "real estate" is often used in a broad sense to mean any estate in land, whether freehold or less than freehold, including such interests as leaseholds. Petitioners claim they have an "equity" in the land measured by the fair market value of the land, less the present value of future lease payments and

the value of the lessor's reversionary interest at the end of the leasehold term. By contrast, their equity in the building is more easily measured by the value of their cash outlay plus the value of the mortgage. The present 1968 value of their obligation to make future lease payments is considered, therefore, an indebtedness which constituted part of the total consideration for their purchase. Though differing in form, they assert that the leasehold contract is financially equivalent to the indebtedness represented by the mortgage loan promissory note which they concurrently signed. In sum, the petitioners argue that the cash outlay, the value of the mortgage promissory note, and the contract value of the leasehold obligation added together represent their true economic cost of purchasing the new residence.

Respondent contends that nonrecognition treatment is improper here because the petitioners did not purchase any land and did not at any time gain an equity in any land. Predicating his argument on the silence found in section 1034 concerning a taxpayer's renting or leasing of all or part of a new residence, respondent dutifully points out that, as holders of a leasehold, petitioners do not now have nor will they ever have an equity in the land; when the lease expires they will have no rights in or to the leased property. Moreover, respondent submits that the legislative history of section 1034 (sec. 112(n) of the 1939 Code) indicates that this provision was adopted to eliminate the hardship formerly suffered by homeowners who found it necessary to sell their houses and reinvest in a new home during periods of high inflation. In most cases arising prior to the enactment of section 1034 a capital gains tax was imposed on the gain from the sale of the old residence. Since the cost of a new residence was often equal to or greater than the sales price of the old residence, the imposition of this tax on gain from the sale of the old residence reduced the amount of money available to purchase a new home. Respondent submits in the instant case, however, that the petitioners received over $30,000 more from the sale of their old residence than they reinvested in the building part of their new residence, and thus the hardship envisioned by Congress simply does not exist here where the imposition of the capital gains tax would neither affect petitioners' ability to purchase the new residence nor make it more difficult for them to maintain their former standard of living.

It is respondent's position that section 1034 must be read alone and not in conjunction with or in comparison to the treatment of leasehold interests under sections 1031 (like kind exchanges) or 1033 (involuntary conversions) of the Code. Respondent asserts further that the provisions of section 1034 and the regulations thereunder include as costs of purchasing a new residence only such amounts as are properly chargeable to capital accounts rather than to current expenses. As defined in section 263, the term capital expenditures includes any amount paid out for new buildings or permanent improvements or betterments made to increase the value of any property. Lease payments, it is argued, in no way improve the value of the house owned by petitioners and are simply ordinary, nondeductible annual expenses. By adding the present value of the future rental payments to the cost of the house, petitioners allegedly are confusing the ordinary recurring cost of mere possession or use of the land with cost representing equity (or potential equity) in property held, i.e., mortgage payments. Respondent contends that if the petitioners' view is adopted periodic recurring costs of fire insurance could be added to the cost of the house as a protective expense. Respondent urges, therefore, that the proper cost basis consists only of outlays for the acquisition of a capital item and any additional expenses which improve or prolong the useful life of property held by the taxpayer. In the instant case respondent finds that the only property owned by the taxpayers is the house itself and that payments pursuant to the ground lease are simply ordinary, recurring personal expenses.

Section 1034(a) [4] provides for nonrecognition of gain upon the sale of an old residence to the extent the proceeds therefrom are reinvested in a new residence under qualifying circumstances. On the other hand, if the new residence costs a taxpayer less than the adjusted sales price of the old residence, any gain realized must be recognized to the extent of the difference. Petitioner urges us to include within the qualifying "cost of purchasing the new residence" the discounted present value of future rental payments

---

[4] The operative provisions of sec. 1034(a) during the year in issue stated:

(a) NONRECOGNITION OF GAIN.—If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

required by a lease assumed in order to acquire supporting real estate for the new residence. However, after a careful review of section 1034, the regulations promulgated thereunder, and related opinions of this Court, we must hold for the respondent and decline to extend the scope of nonrecognition treatment offered by this provision.

Prior to the enactment of section 112(n) of the Internal Revenue Code of 1939, the predecessor to section 1034, the only instance in which a taxpayer could defer recognition of gain upon disposition of a residence was in the case of an involuntary conversion. Thereafter, such nonrecognition was applied to qualifying purchases of new residences, exchanges of one existing residence for another, the construction of replacement residences by taxpayers, and to arrangements where a replacement residence had to be reconstructed in order to permit its occupancy by the taxpayer. These new provisions also encompassed the ownership of stock in cooperative apartment corporations, situations where the taxpayer's residence was part of property also used for business purposes (such as an apartment over a store building or a home on a farm), and a trailer or houseboat used as the taxpayer's principal residence. Joint Committee Staff Summary of Provisions of the Revenue Act of 1951, 1951-2 C.B. 309-310; S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 482-484. Property used by the taxpayer as his principal residence was not intended to include personal property such as a piece of furniture or a radio which, in accordance with the applicable local law, is not a fixture. H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 436.

Upon review of the relevant authorities, we fail to find even tacit approval for the theory advanced by petitioners. Transcending these precedents is an unequivocal mandate that section 1034 nonrecognition of gain be permitted only to the extent that a taxpayer continues to hold title in fee simple to property which is occupied as his principal residence.[5]

In *Marcello v. Commissioner,* 380 F. 2d 499 (5th Cir. 1967), affg. in part and revg. in part a Memorandum Opinion of this Court, the Court of Appeals for the Fifth Circuit affirmed this

---

[5] By use of the term "fee simple" we do not foreclose the possibility that certain other forms of ownership which are considered the equivalent thereof for tax purposes may not also qualify. See sec. 1055 which concerns redeemable ground rents; see also *Oesterreich v. Commissioner,* 226 F. 2d 798 (9th Cir. 1955), relating to whether a lease with option to purchase is in substance a sale.

Court's refusal to apply section 1034 where the vendor of the old residence was not also the vendee of record of the purported new residence. Despite evidence that the taxpayers made all mortgage payments on the new residence, and the existence of an unrecorded affidavit by the vendee of record designating the taxpayers as true owners, the different identities held by the owners of record of the old and new residences was a key factor leading to the court's decision. Crucial too was the fact that the taxpayers who owned and resided in the old residence did not make the purported new residence their home.

This Court subsequently found in two separate Memorandum Opinions that a taxpayer's failure to become the purchaser of record of a new residence within the time constraints imposed by section 1034 prohibits any nonrecognition of gain arising from the sale of an old residence. In *Frank Occhipinti,* T.C. Memo. 1969-190, the taxpayers entered into a contract to purchase a new residence within the statutory period. They failed to fulfill all material conditions of the contract prior to the expiration of that period, however, and the purchase was not yet completed as of that date. Since title did not timely pass to the vendee of the new residence, nonrecognition of gain was disallowed.[6]

Nonrecognition of gain treatment most recently was denied in *Jean L. May,* T.C. Memo. 1974-54, wherein the taxpayer sold her old residence and provided the necessary funds with which her adult daughter purchased a new residence as record owner. Finding no evidence that the taxpayer purchased the new residence, this Court ruled that section 1034 was inapplicable.

Respondent's stance on this matter is contained in Rev. Rul. 55-37, 1955-1 C.B. 347, which was issued under section 112(n) of the 1939 Code, the predecessor of section 1034. A taxpayer sold her residence and utilized the proceeds to help build a new residence on land owned by her daughter's employer, subject to the conditions that (1) title to the new residence be placed in the daughter's name and (2) title eventually be transferred to the employer. Although the taxpayer could inhabit the premises during the remainder of her lifetime and had contributed significantly toward the purchase of the new residence, nonrecognition of gain relief was denied "where the proceeds of the sale are rein-

---

[6] The taxpayers also failed to show that the new residence was occupied as their principal residence within the requisite time period.

vested in a home in which she has no legal interest but to which her daughter holds title." 1955-1 C.B. at 348.

Embodied within the statutory language and authorities set forth above requiring continuity of record title as a precondition to nonrecognition of gain under section 1034 is a desire to prevent taxpayers from enjoying the benefits of tax deferral (current nonrecognition) while placing themselves in a position (as nontitleholders) to escape future recognition altogether. Section 1034 was created to assist those taxpayers compelled to sell their old residences, due to family expansion or shifts in places of employment, who desire to reinvest equal or greater funds in new residences, *as legal owners of record.* Conversely, no relief from recognition of gain was granted to homeowners electing, for any reason, to reinvest a lesser amount than that realized from the sale of an old residence.[7]

Notwithstanding their failure to obtain title to the new land, petitioners contend that in "economic reality" a leasehold of the duration in issue is the practical equivalent of ownership in fee simple and would have us grant nonrecognition relief on that basis. Moreover, they view the regulations issued under section 1031 as supportive of this assertion. We cannot adopt that position here where property located in California is part of a transaction falling within the purview of section 1034. Under California law petitioners' assumption of a lease gave them an estate that "although not 'real property' or 'real estate' * * * is nevertheless an estate in land, an estate in real property." *Parker v. Superior Court, Riverside County,* 9 Cal. App. 3d 397, 400, 88 Cal. Rptr. 352, 354 (1970); Cal. Civ. Code sec. 761 (West 1954). They did not, however, purchase new real property within the intention of section 1034 by assuming this lease for in California a leasehold estate for a term of years is regarded as a chattel real, or personal property, and not real property, Cal. Civ. Code sec. 765 (West 1954). That variances in length of lease term have no effect on this classification was unequivocally established in *Bachenheimer v. Palm Springs Management Corp.,* 116 Cal. App.

---

[7] Congress has granted limited nonrecognition relief to electing taxpayers who have "attained the age of 65 before the date of such sale" and do not reinvest the entire amount realized. Sec. 121, I.R.C. 1954. Note that in order to take advantage of this nonrecognition, however, taxpayers must purchase some new residence and establish continuity of record title. No relief is available to an otherwise eligible taxpayer who sells an old residence and becomes a tenant in premises owned by another or provides the funds for another to purchase as owner of record.

2d 580, 587, 254 P. 2d 153, 160 (2d Dist. Ct. App. 1953), wherein the court stated that "a 999 year lease no less than one for a term of one year is personalty." Thus, even if we were to ignore the provisions in petitioners' lease which retain an absolute and vigorous ownership interest for the lessor, California law precludes us from treating this lease for a term of years as the property which must be purchased as the "new residence" in order to qualify under section 1034. Despite the length of the term of years in issue, we find significant differences between outright ownership and leasehold estates.

Petitioners' reliance on section 1.1031(a)-1(c), Income Tax Regs., is misplaced. Section 1031 and its accompanying regulations govern the nonrecognition treatment accorded qualifying exchanges of property held for productive use or investment, a situation not presented here. The provision in section 1.1031(a)-1(c), Income Tax Regs., allowing a business-oriented, corporate, or individual taxpayer "not a dealer in real estate" to exchange "a leasehold of a fee with 30 years or more to run for real estate" cannot form the basis for a persuasive analogy to section 1034 where Congress has carved out an explicit, nonelective relief measure for individual taxpayers desirous of holding title to their own homes. Petitioners' reliance on Rev. Rul. 68-394, 1968-2 C.B. 338, is erroneous because it primarily involves involuntary conversions under section 1033. Section 1033 is broad in scope and encompasses taxpayers, both individual and corporate, whose business or personal property is destroyed or taken from them. An individual homeowner qualifies for section 1033(a) relief if he loses his old residence (in whole or in part) through "theft, seizure, or requisition or condemnation or threat or imminence thereof"; situations which ostensibly are beyond the taxpayer's control. Since Congress has declared in section 1034(i)(2) that a taxpayer qualifying under both section 1033 and section 1034 after December 31, 1957, must make a timely election to trigger section 1034's particular benefits and pitfalls, we cannot extend the scope of general regulations promulgated under section 1033 to include problems arising under section 1034. These sections evolved from separate and distinct concerns over taxpayer hardships. Although closely related in practice, each section plays a carefully conceived, independent role in the overall scheme of Federal taxation and we may not assume that the absence of express direction concerning

long-term leases under section 1034 indicates that regulations promulgated under other more inclusive sections are determinative of the issue here.

Section 1034 was created to combat a particular taxpayer hardship in the eyes of a legal system imbued with a deep respect for real property and its ownership. Unable to formulate an administratively feasible rule covering only the specific hardships envisioned, Congress produced an extremely mechanical provision which affords nonrecognition relief to all who meet its stated prerequisites and denies relief to the rest. We note, therefore, that we cannot accept respondent's contention that section 1034 should not apply here because petitioners would not suffer in a way envisioned by Congress if we deny their claim. Section 1034 applies to each qualifying taxpayer regardless of whether he would suffer a hardship in this section's absence.

Petitioners assert that Congress clearly intended to include supporting real estate, however obtained, as part of the purchase price of a replacement residence. Drawing upon our opinions in *Stuart M. Hughes,* 54 T.C. 1049 (1970), affd. 450 F. 2d 980 (4th Cir. 1971), and *Benjamin A. O'Barr,* 44 T.C. 501 (1965), we find to the contrary that the essential element of a residence is the dwelling house, not the land upon which it is situated. In each of these cases taxpayers were denied section 1034 nonrecognition relief when they kept title to the dwelling portion of their old residence, sold all or a portion of the land which was part of the old residence, and moved into new residences.[8] We find here that a dwelling house also constitutes the essential element of a new residence. A new residence may consist of either a dwelling alone or a dwelling combined with adjacent real property; there is no requirement that the land upon which a new dwelling is situated be deemed part of the new residence in all circumstances.[9]

---

[8] In *Benjamin A. O'Barr,* 44 T.C. 501 (1965), the taxpayers purchased and moved into a new residence. Their old residence, less the land sold, was then occupied by the taxpayers' daughter and her family. The taxpayers in *Stuart M. Hughes,* 54 T.C. 1049 (1970), affd. 450 F. 2d 980 (4th Cir. 1971), occupied a new residence owned by another, kept title to their old dwelling and moved it to new real estate which they purchased, and sold the land which formerly supported their old dwelling.

[9] Nonrecognition relief was extended to a taxpayer who purchased new land, moved his dwelling to it, and sold the land upon which the dwelling originally was located in Rev. Rul. 54-156, 1954-1 C.B. 112, approved by this Court in *Stuart M. Hughes, supra* at 1055. In this peculiar instance land was allowed to dominate the dwelling involved and qualify as the required old and new residences. This ruling is limited strictly to the facts upon which it was published; in other situations it is not an essential ingredient of any residence within the meaning of sec. 1034.

Since our decision is consistent with the position assumed by respondent in Rev. Rul. 72-266, 1972-1 C.B. 227, we approve that ruling as it applies to the factual situation presented here.

To reflect this conclusion and the concession of another issue,

*Decision will be entered under Rule 155.*