[Civ. No. 52268. Second Dist., Div. Five. Dec. 18, 1978.]

MORRIS CORSON, Plaintiff and Appellant, v.
BROWN MOTEL INVESTMENTS, INC., et al.,
Defendants and Respondents.

Counsel

Michael Korn for Plaintiff and Appellant.

John D. Gray for Defendants and Respondents.

Opinion

**STEPHENS, Acting P. J.**—Plaintiff, Morris Corson, appeals from an adverse judgment by the court below in his action for breach of contract and fraud. The judgment on the first two causes of action only is being appealed.

Facts

The material facts are not in dispute. In October 1971 Corson learned that the Los Angeles Hyatt House (Hyatt) was for sale. Corson, who was interested in leasing the Hyatt, contacted Jack Schleifer as a possible purchaser of the property. Negotiations for the purchase and lease followed. Defendant Brown Motel Investments, Inc. (BMI), of which defendant George A. Brown is president, was the broker for the sale. Corson and his then attorney, James Cohen, apparently handled the lease transaction.

On June 30, 1972, plaintiff and defendant entered into an agreement whereby BMI was to pay $25,000 to Corson if Corson *did not* "receive a Leasehold" on, and BMI received a commission from the sale of, the Hyatt. On October 6, 1972, a "Lease Indenture" was executed by and between Fairfield Hotel Corporation (Fairfield) and Harvy House, Inc. (Harvy House), which was a corporation formed by Corson, with Corson as its president. At the same time, a collateral agreement was signed which provided that Harvy House was to take possession under the lease agreement upon the payment of $100,000 and fulfilling of certain other obligations. The agreement also provided that certain closing adjustments from the sale transaction were to be paid to Corson. The escrow for the sale of the Hyatt closed on November 8, 1972.

From this point on many of the facts, and the relevance thereof, are in dispute. Suffice to say the $100,000 provided for in the October 6 collateral agreement was not paid, and Corson received neither actual possession of the Hyatt nor $25,000 from BMI. The trial court found, in essence, that Corson's nonpayment was a breach of the collateral agreement, and was the reason Corson never received a leasehold. Judgment was therefore granted in favor of defendants. The judgment was also in defendants' favor on the fraud count.

### Introduction

■ Initially, we hold that it was proper for the trial court to receive evidence and make findings relative to the lease indenture and collateral agreement. Although excuses for nonperformance, not apparent on the face of the contract, must be set up as affirmative defenses (*Eucalyptus G. Assn.* v. *Orange C.N. & L. Co.* (1917) 174 Cal. 330, 335 [163 P. 45]), the excuse asserted by defendants—procurement of a leasehold—is expressly stated in the contract. Plaintiffs cannot realistically claim they were surprised by use of the lease documents as a defense of this lawsuit. The three documents—the June 30 agreement, the lease indenture, and the collateral agreement—are part of one large transaction, and each should be construed in light of the others, as the court below did. (See *Symonds* v. *Sherman* (1933) 219 Cal. 249, 253 [26 P.2d 293]; *Harm* v. *Frasher* (1960) 181 Cal.App.2d 405, 413 [5 Cal.Rptr. 367].)

We, as did the trial court, find it unnecessary to construe the term "leasehold" as used in the contract in dispute. Whether the term denotes actual possession of the Hyatt, as urged by plaintiff, or merely requires the signing of a lease agreement, as urged by defendants, the real questions are whether Corson had a right to possession, and whether he did all he could to exercise that right.

### Corson's Right to Obtain
### Possession of the Hyatt

Upon signing the lease indenture and collateral agreement, Corson gained the enforceable right to take possession of the Hyatt as lessee, provided the landlord (Fairfield) gained title to the hotel, and Corson paid $100,000. These conditions precedent do not make this an agreement to lease. ■ Whether a document is a lease or mere agreement to lease

is primarily a question of intent of the parties. (*Gavina* v. *Smith* (1944) 25 Cal.2d 501, 503 [154 P.2d 681].) The trial court impliedly found that the parties intended the document to be a lease. There was substantial evidence to support this conclusion. Corson's own declaration in another, related, case (NWC-31900) states that he entered into a written agreement by the terms of which the Hyatt was leased to plaintiff. Indeed, the lease indenture itself states: "The term of this lease shall be for a period of ten (10) years, commencing on the date of acquisition of title by Landlord." Clearly, the parties were aware of the pending sale, and intended this to be a binding lease agreement, without the execution of any other or further instrument. The documents constituted a valid lease *in praesenti* for a term to commence in futuro. (*Imperial Water Co.* v. *Cameron* (1924) 67 Cal.App. 591, 595-596 [228 P. 678].) The instrument here in question granted Corson the right to occupy a parcel of land to the exclusion of the grantor. That is all that is required of a lease. (*Bachenheimer* v. *Palm Springs etc. Corp.* (1953) 116 Cal.App.2d 580, 591 [254 P.2d 153].)

■ Delivery is certainly a prerequisite to the validity of a lease. (Civ. Code, § 1626.) We hold that there was substantial evidence to support the trial court's implied finding that there was a delivery. Cohen, Corson's attorney and agent, received physical delivery of the lease, with Corson's knowledge. In fact, Corson received a copy of the letter pursuant to which Cohen held the lease. When a lessee directs or agrees that a lease may be left for him with a third party, delivery to the latter is equivalent to a delivery to the lessee. (*City Lumber Co.* v. *Brown* (1920) 46 Cal.App. 603, 606 [189 P. 830].) The fact that Schleifer reserved the right to take back the lease upon nonpayment of the $100,000 is irrelevant. Such nonpayment would have been a breach of the agreement, thereby nullifying its terms.

Although St. Jame Hotel Corporation (St. Jame), not Fairfield was the entity which received title to the Hyatt, the trial court had sufficient evidence before it to find, as it did, that both of these entities were owned by, and alter egos of, Schleifer. In verified, albeit superseded, pleadings, as well as in declarations, in a related case (NWC-31900) of which the trial court took judicial notice, Corson stated that St. Jame and Fairfield were the alter egos of Schleifer, and that all three had entered into the lease agreement with Corson. The trial court was entitled to treat this as evidence. (Witkin, Cal. Evidence (2d ed. 1966) The Hearsay Rule, § 496, p. 467; § 503, p. 473.) In addition, Corson testified that Schleifer had informed him of Schleifer's ownership interest in Fairfield. There was no

contradictory evidence. The trial court was entitled to reach the conclusion it did based on this evidence alone. (Evid. Code, § 411; *Menning* v. *Sourisseau* (1933) 128 Cal.App. 635, 639 [18 P.2d 77].)

*Corson's Breach of the Lease
Agreement*

Even if the term "leasehold" as used in the June 30 contract is interpreted to mean actual possession, the fact that Corson never occupied the premises is not determinative. ■ Every party to a contract has a duty to do everything incumbent upon him to accomplish the purpose of the contract, and a duty not to do anything which interferes with the right of the other party to receive the benefits of the contract. (*Brown* v. *Superior Court* (1949) 34 Cal.2d 599, 564 [212 P.2d 878]; *Bewick* v. *Mecham* (1945) 26 Cal.2d 92, 99 [156 P.2d 757, 157 A.L.R. 1277].) The trial court was correct in receiving evidence relating to a possible breach of these duties. We hold that there was substantial evidence to support the trial court's finding that these duties were breached by Corson's failure to comply with collateral provisions to the lease.

By the terms of the collateral agreement, Corson was to pay a total of $100,000 before the lease took effect. It appears that Corson never had that much money. His attorney testified that only $70,000 in cash plus $25,000 for which Corson had signed a note were available when the payment was due. In any event, the $100,000 was in fact not paid. The dispute over closing adjustments is irrelevant; by the express terms of the agreement, the $100,000 was to be deposited before closing adjustments were calculated and paid over.

Plaintiff also breached paragraph "THIRD" of the collateral agreement by not obtaining a liquor license. The burden was upon Corson to do so, and, in fact, the Department of Alcoholic Beverage Control requires the purchaser (Corson) to be fingerprinted. Corson therefore could not possibly require, nor expect, anyone else to obtain the license for him. He had the burden of obtaining it, and did not.

We do not interpret the collateral agreement as requiring 10 days' notice for deposit of the $100,000. The deposit was to be made 10 days before escrow closed, regardless of when notice was given. In any event, Corson testified he would have had that amount on November 8 or 9

when escrow closed, yet he did not pay over this amount. Dates stated in the agreement were not adhered to.

Finally, the fact that no notices of breach were given is irrelevant to this action. Once the agreement was breached, Corson failed in his duties to defendants, who were thereby absolved from liability on their contract.

### Fraud Issue

The evidence supports the trial court's finding that there was no fraud on the part of defendants. George E. Brown's testimony that he did not intend to pay the $25,000 is taken out of context. He did not think he would have to pay because he was sure a lease arrangement would be consummated.

BMI sent a letter to Corson on October 14th stating that it understood the signing of the lease agreement as absolving it of liability under the June 30 contract. This was not a fraudulent repudiation, but merely a statement of what BMI interpreted to be its legal rights.

### Reading From Deposition

Plaintiff asserts error in the reading of Corson's deposition at trial. However, no prejudice has been shown, and we cannot find any indication that admission of this evidence resulted in a miscarriage of justice; we, therefore, do not reverse the judgment. (Cal. Const., art. VI, § 13.)

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied January 9, 1979, and appellant's petition for a hearing by the Supreme Court was denied February 14, 1979.