**In re SCCC ASSOCIATES II LIMITED PARTNERSHIP, a California limited partnership, Debtors.**

**Bankruptcy No. 92–56224–JRG.**

United States Bankruptcy Court, N.D. California.

Sept. 17, 1993.

Merle Myers, Goldberg, Stinnett & MacDonald, San Francisco, CA, for debtor SCCC Associates II Ltd. Partnership.

Elaine M. Seid, Thelen, Marrin, Johnson & Bridges, San Jose, CA, for City of Santa Clara and Redevelopment Agency for the City of Santa Clara.

### OPINION

JAMES R. GRUBE, Bankruptcy Judge.

### I. INTRODUCTION.

Before the court is the motion for summary judgment by the City of Santa Clara (the "City") and Redevelopment Agency

for the City of Santa Clara (the "Agency") and the counter-motion for summary judgment by SCCC Associates II Limited Partnership (the "Debtor"). The motions concern, among others, the following issue:

Whether the agreement between the Agency and Debtor entitled "Trade Center Ground Lease" is a true lease subject to § 365 of Title 11 of the United States Code or a disguised security interest not subject to § 365?[1]

The court finds that the agreement is a lease subject to § 365.

## II. PROCEDURAL BACKGROUND.

Debtor filed a petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on September 3, 1992. The primary asset of the estate is an interest in land improved by a building commonly referred to as the Techmart Building. Debtor's interest in the land on which the Techmart Building lies is memorialized in documents denominated TRADE CENTER GROUND LEASE, executed on April 29, 1985; FIRST AMENDMENT TO TRADE CENTER GROUND LEASE, executed on November 25, 1987; SECOND AMENDMENT TO TRADE CENTER GROUND LEASE, executed on December 20, 1988; and THIRD AMENDMENT TO TRADE CENTER GROUND LEASE, executed on July 7, 1989 (collectively referred to as the "Agreement").

Debtor asserts that the Agreement, although denominated a lease, has the economic substance of a financing arrangement or a joint venture agreement and is thus not subject to § 365. Nevertheless Debtor moved for an extension of time to assume or reject the Agreement pursuant to § 365(d)(4)[2] as a precautionary measure. The Agency opposed Debtor's motion and filed its own motion for an order directing Debtor to assume or reject the Agreement immediately. The Agency alternatively argued that Debtor's rights under the Agreement terminated before the filing of the bankruptcy petition. The court granted Debtor's motion for an extension of time to assume or reject the Agreement pending determination of the Agreement's legal status. The court applied the procedural rules governing adversary proceedings[3] to the dispute, which allowed the parties to bring competing motions for summary judgment.

## III. THE UNDISPUTED FACTS.

As noted above, the motions before the court seek summary judgment. Debtor asserts that the nature of the development, the terms of the Agreement, and the manner in which the parties conducted themselves, establish that the economic substance of the Agreement is that of a joint venture or financing arrangement. The Agency, on the other hand, asserts that the plain meaning of the Agreement establishes that it is a lease. The following is a list of factual contentions listed in Debtor's and/or the Agency's statements of undisputed facts, which were, in fact, not disputed.

### A. The Redevelopment Plan.

During the early 1970's the City adopted a redevelopment plan (the "Plan") for the Bayshore North Project which designated approximately 1,200 acres in the northwestern corner of the City as a redevelopment project (the "Redevelopment Area") under the State of California Community Redevelopment Law. The Plan declared that the Redevelopment Area was "blighted" because it lacked urban utilities, physical access was barred, its streets were inadequately designed, and it generally lacked economic land use. The Plan determined that urbanizing the Redevelopment Area would increase the City's tax base. The City acquired real property known as the Guadalupe West Area in the Redevelopment Area from private parties. The Guadalupe West Area is the property roughly

---

**1.** Unless otherwise indicated all sections refer to Title 11 of the United States Code.

**2.** Section 365(d)(4) provides that a debtor must assume or reject an unexpired lease of nonresidential real property within sixty days of the filing of the petition. If the debtor takes no action, the lease is deemed rejected.

**3.** *See* Fed.R.Bankr.P. 7000–7087.

bounded by Great America Parkway, Tasman, and the San Thomas Creek (the "Site"). At the time of adoption of the Plan the City owned the Site and, as the City considered the development of the Redevelopment Area, it determined that it would maintain ownership of the land.

Kimball W. Small is the president of Techmart Property, Inc., a California corporation, which is the general partner of Techmart Associates II Limited Partnership. Techmart Associates II Limited Partnership is the general partner of Debtor. Mr. Small is a developer who was known to the City for his development of a real estate project known as Oakmead. Mr. Small became aware of the City's desire to develop a convention center at the Site and made a formal proposal to the City that it also allow for development of a hotel and trade center at the Site by two partnerships formed or to be formed by Mr. Small. The City was supportive and enthusiastic about Mr. Small's proposal.

### B. *The Site.*

During 1983, the Plan was amended to reflect the City's desire to develop a major hotel and a trade center at the Site. The City conveyed the Site, consisting of four parcels, to the Agency to implement the Plan.

The Plan divides the Site into four parcels. Parcel 1 is the pad for the Hotel. Parcel 2 is the pad for the trade center (referred to in this opinion as the "Techmart Building"). Parcel 3 is the pad for the Convention Center. Parcel 4 consists of all the surrounding property. It is designed for the common areas and public improvements within the Site including an area for a parking structure. Debtor acquired an interest in Parcel 2 under the Agreement.

Together the four parcels are commonly referred to as the Convention Center Complex (the "Complex"). The Complex was intended to be an integrated development with Parcels 1, 2, and 3 sharing the benefits and burdens of the common areas and public improvements ("Common Area Improvements") constructed on Parcel 4. The Agency constructed the Common Area Improvements, which include the parking structure, sidewalks, lighting, and driveways throughout the Site, for the beneficial use of Parcels 1, 2, and 3. The construction costs for the Common Area Improvements were prorated among Parcels 1, 2 and 3, according to their relative beneficial use as determined by an engineering study.

### C. *The Common Area Improvements.*

For the construction of the Common Area Improvements and to assist in the financing of the Hotel's and Debtor's share of the construction cost of the Common Area Improvements, the City formed Improvement District #186. Improvement District #186 issued public tax exempt bonds to finance the Hotel's and Debtor's share of the construction cost of the Common Area Improvements. Debtor's share of the obligation to repay the bonds is arranged by way of special assessments which are collected with Debtor's property taxes each year in pre-arranged amounts until the bonds are retired.

In addition to contributing to the construction cost for the Common Area Improvements, Parcels 1, 2, and 3 have the continuing obligation to pay their pro rata share of the cost of maintaining the Common Area Improvements. Debtor, the Hotel, and the Convention Center have joint responsibility for cleaning, repairing, maintaining, and replacing the Common Area Improvements.[4] The City formed Maintenance District #183 to maintain the Common Area Improvements. Debtor's share of the cost of maintaining the Common Area Improvements is also collected with its property taxes.

### D. *The Terms of the Agreement.*

Debtor does not dispute that it entered into the Agreement on April 23, 1985, and

---

**4.** Section 1411 of the Agreement specifies the procedure of budgeting for the maintenance costs, allocating the costs between the Hotel, the Techmart Building, and the Convention Center, as well as collecting the prorated contribution from each parcel.

that all the terms contained in the Agreement were, in fact, negotiated between Debtor and the Agency. In general, the Agreement provides for Debtor to make monthly payments to the Agency, denominated as rents, for an initial term of fifty years, expiring on April 30, 2036.

For purposes of determining the rent, the initial term is divided into two periods, Sub–Term A and Sub–Term B. Sub–Term A covers the first twenty-four months. Sub–Term B covers the balance of the initial fifty year term. Provided that Debtor is not in default under the Agreement and that it properly exercises its rights, Debtor has the option to renew the Agreement for four additional periods of ten years each and one additional period of nine years, for a total maximum term of ninety-nine years. At each ten year interval during Sub–Term B the rent is to be reappraised either by agreement of the Agency and Debtor or by an appraisal procedure set forth in the Agreement. Also, within each ten year period in Sub–Term B the rents may be increased based on a cost of living adjustment. The amounts denominated as "rents" under the Agreement cannot, however, be reduced below the amount previously charged even if fluctuation in the cost of living index so indicates. Agreement § 302.[5]

Debtor's obligation to pay rent under the Agreement is excusable under certain circumstances, e.g., if Debtor is unable to economically continue using Parcel 2 due to major destruction of the Techmart Building or the taking of a part or all of the Techmart Building by eminent domain. In the event of fire or damage to the Techmart Building, where the cost of restoration would exceed the amount of any insurance proceeds, Debtor has the election to restore the Techmart Building or to terminate the Agreement. Agreement § 706. However, in the event the Agreement is terminated based on Debtor's breach, Debtor would be liable for damages in an amount equal to the remaining obligations under the Agreement less the rental loss that the Agency could avoid. Agreement § 1211. The Agreement provides that rent and all sums payable to the Agency under the Agreement have priority over all other expenses of Debtor related to the Techmart Building. Agreement § 308.

Debtor is required to pay all taxes and government assessments as they become due.[6] Debtor is required to pay property taxes based on a fee, as opposed to a leasehold interest, in the underlying land. Agreement § 610. Debtor was also required to pay transfer taxes upon the recordation of the Agreement.

Mr. Small initially wanted to acquire title to Parcel 2. However, the Agency refused to sell the land to Debtor. The Agency also refused to grant Debtor an option to purchase the land. Instead, Debtor only received a right of first refusal to purchase the land in the event the Agency decided to sell its interest during the term of the Agreement.

The Agreement contemplated that Debtor would develop the Techmart Building at its own cost. It was not anticipated that the Techmart Building would have a useful life beyond ninety-nine years at the time the Agreement was negotiated. During the term of the Agreement, Debtor has the right to mortgage its interest in Parcel 2 and the Techmart Building. Certain rights and remedies are afforded the party that acquires such a mortgage, who is referred to in the Agreement as the "Leasehold Mortgagee," including the right to cure Debtor's default and thereafter assume Debtor's rights and obligations under the Agreement.

### E. *Negotiation of the Second Amendment to the Agreement.*

Gibraltar Savings & Loan ("Gibraltar") financed Debtor's construction of the Techmart Building with a loan in the original

---

**5.** Debtor desires to treat the Agreement like a mortgage and rewrite its terms to conform to the economic reality that the Complex is not as successful as anticipated.

**6.** The Agreement refers to taxes and government assessments, including special assessments for Improvement District # 186 and Maintenance District # 183, as "Impositions."

principal amount of $53,125,000. Debtor subsequently defaulted on its obligation to pay property taxes and various assessments. Debtor represented to the Agency that it was experiencing difficulty in fully leasing the Techmart Building and that it was unable to finance necessary tenant improvements.

Debtor informed the City that it was also having difficulty in obtaining permanent financing for the Techmart Building. Debtor further represented that it had negotiated a restructuring of the Gibraltar loan which would permit Debtor to pay all past due property taxes and assessments and provide the necessary capital to market the Techmart Building and fund tenant improvements. Accordingly, Debtor requested the Agency's assistance by renegotiating the terms of the Agreement.

Negotiations between the Agency and Debtor culminated in the Second Amendment to the Agreement (the "Second Amendment") which was executed on or about December 20, 1988. The Second Amendment provides, among other things, that the Agency will subordinate and, to the extent needed, defer its collection of rents during a five year period, from October 1, 1988 through October 1, 1993. In return, the Agency is given the right to receive three percent of the gross sale proceeds in excess of $65 million upon the sale of Debtor's interest in the Techmart Building. Second Amendment to the Agreement, ¶¶ 8.2, 9.5. The Second Amendment also provides that Debtor is to distribute the revenue from the Techmart Building in the following priority: first, to payments denominated "Operating Expenses," which specifically include all real property taxes and assessments; second, to current interest accruing on the Gibraltar loan; third, to the Agency for obligations denominated rent under the Agreement; fourth, to the unpaid debt service owed to Gibraltar; and fifth, to deferred rents owed to the Agency. No rents have been paid by Debtor to

the Agency since the commencement of the deferral period on October 1, 1988.

**F. Agency's Pre-petition Attempt to Terminate the Rights of Debtor and the Leasehold Mortgagee Under the Agreement.**

Debtor failed to pay the April 1, 1991, installment of real property taxes and assessments and has failed to make each installment of taxes and assessments which became due thereafter. Debtor's failure to pay these impositions constitutes a default under the Agreement. On May 1, 1992, the City, on behalf of Improvement District # 186, notified Debtor in writing of its delinquent installments in the amount of $1,174,914.79. On May 15, 1992, the Agency sent Debtor a document entitled "Pre-Notice of Failure to Perform Obligations" advising that Debtor's failure to pay property taxes and assessments for Improvement District # 186 and Maintenance District # 183 were failures to perform under §§ 603 and 610 of the Agreement and demanding that Debtor provide evidence of performance within fifteen days.[7] The Agency's pre-notice further advised Debtor that failure to perform within fifteen days of receipt of the pre-notice would constitute a default under the Agreement [8] giving the Agency the right to serve Debtor with a notice of default.

On June 9, 1992, upon Debtor's failure to comply with § 1201 of the Agreement by providing evidence of payment of past due taxes and assessments as requested, the Agency served Debtor with a document entitled "Notice of Default and Demand to Cure." The notice advised Debtor that it had thirty days from receipt to cure all defaults, consisting of its failure to timely pay property taxes, Improvements District assessments, and Maintenance District assessments. On or about June 22, 1992, the Agency was notified by letter of the assignment of the Gibraltar loan to West Coast Acquisition Partners ("West Coast")

---

**7.** The Agreement requires the Agency to serve Debtor with a pre-notice of Debtor's default prior to terminating the Agreement. Agreement § 1201.

**8.** Agreement § 606.

and that West Coast had collaterally assigned the loan to GE Capital Corporation ("GE"). The June 22, 1992, letter served to formally notify the Agency of the appropriate address of West Coast for service of notices to it as the Leasehold Mortgagee under the Agreement.

On July 30, 1992, upon Debtor's failure to cure its default during the thirty day cure period, the Agency elected to terminate the Agreement pursuant to § 1211 of the Agreement. The Agency served Debtor with a document entitled "Notice of Termination of Agreement" advising Debtor of the Agency's termination of the Agreement effective September 3, 1992. In addition to the notice of termination sent to Debtor, on July 30, 1992, the Agency served West Coast and GE with a document entitled "Notice of Expiration of Cure Period," advising them that Debtor had failed to cure its default and advising West Coast of its rights as the Leasehold Mortgagee to cure the default under § 902 of the Agreement.

The July 30, 1992 letter advised West Coast that upon its failure or election not to perform and to preserve its rights under § 902, the Agreement would effectively terminate on September 3, 1992. The effective date of the termination was delayed to September 3, 1992, in order to afford the Leasehold Mortgagee the opportunity to exercise its rights and remedies under § 902 of the Agreement. Section 902 rights and remedies are specifically reserved for the Leasehold Mortgagee. The Agreement is very detailed and specific as to the manner in which the Leasehold Mortgagee must exercise its rights. The Leasehold Mortgagee, upon curing the defaults, may enter into a new lease with the Agency under the same terms as the Agreement.

West Coast failed to take the necessary steps to cure Debtor's default under the Agreement. Debtor then filed its Chapter 11 petition on the day West Coast's rights under the Agreement were to expire, September 3, 1992.

## IV. *ANALYSIS.*

Debtor admits that it is unable to cure the defaults under the Agreement or to assume the Agreement under the terms set forth in § 365(b) of the Bankruptcy Code. Debtor asserts that it may modify the rights of the Agency under the Agreement pursuant to a plan of reorganization. Debtor's position depends on the court's determining that the economic substance of the Agreement is not that of a lease designed to be covered by § 365. The Agency asserts that the Agreement, consistent with its title and its terms, is a lease of the ground on which the Techmart Building was developed and that § 365 does apply.

The Bankruptcy Code does not specify what constitutes a lease under § 365. "Where 'Congress has not chosen to exercise its power to fashion [a bankruptcy] rule[,] ... [it] has generally left the determination of property rights ... to State law.'" *In re Harris Pine Mills*, 862 F.2d 217, 220 (9th Cir.1988) (quoting *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979)). The parties concur that the Agreement is governed by California law. If an agreement is determined to be a lease under applicable state law, further analysis may be warranted under the Bankruptcy Code. *Harris Pine Mills*, 862 F.2d at 220 n. 6. In determining whether an agreement is a lease within the purview of § 365, "the appropriate focus is on the ... economic realities of [the agreement]." *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir.1988). As is further explained below, the economic substance of the Agreement is analyzed under California law. Therefore no separate analysis, under bankruptcy law, of the "economic realities" of the Agreement is necessary. The first question the court must answer is whether the Agreement is a "lease" under California law.

### A. *The Agreement is a Lease under California Law.*

Although denominated a lease, an agreement which does not establish a landlord-tenant relationship is not a lease. *Moss v. Williams*, 84 Cal.App.2d 830, 835,

191 P.2d 804 (1948). Debtor argues that the economic substance of the Agreement is more akin to that of a joint venture or a disguised security interest and submitted evidence extrinsic to the Agreement in support of its position. The Agency asserts that the Agreement has a plain meaning and that the parol evidence rule prohibits the court from examining evidence extrinsic to the Agreement.

### 1. *The parol evidence rule.*

An excellent definition of the parol evidence rule is found in *BMW of North America, Inc. v. New Motor Vehicle Board,* 162 Cal.App.3d. 980, 209 Cal.Rptr. 50 (1984):

> The parol evidence rule is a fundamental rule of contract law which operates to bar extrinsic evidence contradicting the terms of a written contract.... It is not merely a rule of evidence but is substantive in scope.... Under that rule the act of executing a written contract, whether required by law to be in writing or not, supersedes all of the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.... Extrinsic evidence cannot be admitted to prove what the agreement was, not for any of the usual reasons for exclusion of evidence, but because as a matter of law the agreement is the writing itself.... Consequently, "in determining whether substantial evidence supports a judgment, extrinsic evidence inconsistent with any interpretation to which the instrument is reasonably susceptible becomes irrelevant; as a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. Irrelevant evidence cannot support a judgment."

*Id.* at 56–57 (citations omitted). However,

> extrinsic evidence is admissible to prove a meaning to which the language of a contract is reasonably susceptible, even though on its "four corners" the instrument appears to the court to be clear and unambiguous....

> [T]his rule ... does no more than allow extrinsic evidence of the parties' understanding and intended meaning of the words used in their written agreement.

*Brawthen v. H & R Block, Inc.,* 28 Cal. App.3d. 131, 104 Cal.Rptr. 486, 490 (1972) (emphasis omitted).

> The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides that the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is than admitted to aid in the second step—interpreting the contract.

*Winet v. Price,* 4 Cal.App.4th 1159, 1165, 6 Cal.Rptr.2d 554, 557 (1992).

> [R]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties.... Such evidence includes testimony as to the circumstances surrounding the making of the agreement ... including the object, nature and subject matter of the writing ... so that the court can "place itself in the same situation as the parties found themselves at the time of contracting."

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 442 P.2d 641, 645, 69 Cal.Rptr. 561, 565 (1968) (citations omitted) (footnotes omitted). Under California law, the intention of the parties is of paramount consideration in interpreting a contract. Cal.Civ.Code §§ 1636, 1640 (West 1993).

### 2. *Although admissible, the extrinsic evidence, when considered with the terms of the Agreement, is insufficient to establish that the Agreement is a joint venture under California law.*

Debtor asserts that the following evidence supports its argument that the Agreement is something akin to a joint venture:

(1) The Agency publicly referred to the development of the Site as a "public-private partnership."

(2) The Agency paid in full the settlement of a claim by a general contractor against the Agency, Debtor, and the Hotel;

(3) The Agency constructed the Common Area Improvements; and

(4) The Agency has the right to receive three percent of the gross proceeds in excess of $65 million upon a sale of Debtor's interest in the Techmart Building.

Only items (1) and (2) are extrinsic to the Agreement. In order to determine whether the extrinsic evidence is relevant to prove that the Agreement is "reasonably susceptible" to being interpreted as a joint venture, the court must first determine what a joint venture is under California law.

A joint venture is similar to a partnership:

A partnership connotes co-ownership in a partnership property with a sharing in the profits and losses of a continuing business. A joint venture has no corporate or partnership designation. It is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. Such a venture or undertaking may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties.

*Nelson v. Abraham,* 29 Cal.2d 745, 177 P.2d 931, 933 (1947) (en banc). A sharing in both profits and losses is an essential element of a joint venture. *Tipton v. Bearl Sprott Co.,* 93 F.Supp. 496, 499 (S.D.Cal.1950). Another element common to joint ventures is joint participation to some extent, in the management of the business. *Dickenson v. Samples,* 104 Cal. App.2d 311, 231 P.2d 530, 533 (1951).

The facts that the Agency referred to the redevelopment project as a partnership and

paid a settlement which, in part, benefitted Debtor are relevant to the argument that the relationship of the parties is that of joint venturers. Accordingly, the above evidence is admitted. The above facts are not disputed by the Agency. However, full analysis of the evidence shows that the Agreement does not represent a joint venture.[9]

In this case, the economic substance of the Agreement is not consistent with the definition of a joint venture under California law. The business of Debtor is management of the Techmart Building. The Agency does not share in any losses or profits generated from the operation of that business. That is, Debtor's obligation to make the monthly payments denominated as "rents" under the Agreement are not contingent upon there being sufficient cash flow from the operation of the Techmart Building. Also, although the Agency does have some control over Debtor's decisions with regard to operation of the Techmart Building, the supervisory powers which the Agency retains are not of such a nature as to deprive Debtor of essentially exclusive possession of Parcel 2. *See Tipton,* 93 F.Supp. at 499 (court held that agreement was a lease notwithstanding that lessor exercised substantial control over the operations of the lessor). The lessor in *Tipton* exercised substantially greater control over the operation of the lessee's business affairs than the Agency exercises over Debtor's business affairs.

It is true that the Agency publicly referred to the development of the Site, that is Parcels 1, 2, 3, and 4, as a "public-private partnership." However, it is also clear that the Agency used those terms in the lay-sense and not in their legal sense.

The fact that the Agency financed the settlement of a dispute which arose during construction of the Common Area Improvements does not establish that the Agency and Debtor are joint venturers. The City had to pay its share of the settlement, that is the share relating to the Convention Cen-

9. Although it is not determinative, the Agreement itself states that it does not create a partnership. Agreement § 1305.

ter, in any event. Importantly, the City was reimbursed from the Hotel and Debtor for the advance.

The fact that the Agency developed the Common Area Improvements for the benefit of Parcels 1, 2, and 3 does not establish that the Agency and Debtor are joint venturers. The undisputed facts establish that the Common Area Improvements were developed not only for the benefit of Debtor, but also for the City's benefit as the City constructed and owns the Convention Center. Moreover, the Agreement requires Debtor to pay the Agency for using the Common Area Improvements. Agreement § 602.

Lastly, the fact that the Agency is entitled to three percent of the gross proceeds in excess of $65 million received by Debtor upon the sale of its interest in the Techmart Building does not create a joint venture. The undisputed evidence establishes that this term was in consideration for the Agency's agreement to defer collection of rent for five years when negotiating the Second Amendment to the Agreement. There is simply no provision in the Agreement or extrinsic to the Agreement that provides that the Agency would share in the profits or losses of Debtor's operation of the Techmart Building. Since that is an essential element of a joint venture under California law, the court finds that ·the economic substance of the Agreement is not that of a joint venture.

**3. *Although admissible, the extrinsic evidence, when considered with the terms of the Agreement, is insufficient to establish that the Agreement is a financing device under California law.***

With regard to Debtor's alternative argument that the Agreement is in economic substance a financing device, the only evidence extrinsic to the Agreement which Debtor submits is the testimony of various individuals that the amounts denominated as "rents" under the Agreement were determined by applying a percentage return to the value of the land and testimony that the Techmart Building was believed to have a useful life of approximately ninety-nine years, which is the maximum term of the Agreement. In order to determine whether the extrinsic evidence is relevant to prove that the Agreement is "reasonably susceptible" to being interpreted as a financing device, the court must determine what a financing device is under California law.

California Civil Code section 2924 provides that "[e]very transfer of an interest in a property ... made only as a security for the performance of another act, is to be deemed a mortgage." Cal.Civ.Code § 2924 (West 1993). "Where an instrument transferring an interest in real property is not what it purports to be, but is intended as security, courts may determine the intention of the parties based on all evidence including evidence of the circumstances under which the agreement was entered into." *Gronenschild v. Ritzenthaler,* 81 Cal.App.2d 138, 145, 183 P.2d 720 (1947). Debtor asserts that the Agreement is a device by which the Agency attempts to secure the sale price of the land. That is, the Debtor asserts that the alleged "lease" is really a disguised sale of the land to Debtor. The argument continues as follows: The amounts designated as "rents" under the Agreement are actually mortgage payments; Parcel 2 will have no economic value at the end of the Agreement's anticipated term of ninety-nine years; and the terms of the Agreement were designed to secure Debtor's payment of the "sale" price. The court finds the extrinsic evidence offered by Debtor relevant and therefor admissible to prove that the Agreement is reasonably susceptible to being interpreted as a financing agreement. The Agency does not dispute the above facts. However, the extrinsic evidence, when viewed with the terms of the Agreement, does not establish that the Agreement is a financing device.

Simply put, Debtor's contention that the Agreement is a disguised sale of Parcel 2 lacks merit. Debtor argues that the Techmart Building will have no value at the end of ninety-nine years. However, the land on which the Techmart Building lies will have a value in ninety-nine years and, in fact, may be more valuable than it is today. The

lease is of the land, not the Techmart Building.

The fact that the "rents" are calculated based on the present value of the land is not inconsistent with a lease. The parties agree that calculation of market rent for a ground lease is difficult because the value of the use of the land depends on what will be developed on the land.

It is undisputed that Debtor would like to have purchased the land. However, it is also undisputed that the Agency and City refused to sell the land to Debtor and the Debtor did not obtain an option to purchase the land under the Agreement. All Debtor was able to negotiate was a right of first refusal.

Debtor argues that it has all the burdens of an owner of the land in that: it had to pay a transfer tax upon recordation of the Agreement; it pays taxes based on a fee rather than a leasehold interest in the land; and the terms of the Agreement are "triple net." However, these terms appear to be similar to normal terms contained in other ground leases. *In re Port Angeles Waterfront Assocs.*, 134 B.R. 377 (9th Cir. BAP 1991); *In re Lansing Clarion Ltd. Partnership*, 132 B.R. 845 (Bankr.W.D.Mich. 1991); *In re Arizona Appetito's Stores, Inc.*, 893 F.2d 216 (9th Cir.1990). It is simply not true that Debtor maintained all the indicia of ownership. If the improvements on the land, *i.e.*, the Techmart Building, are destroyed, Debtor has the right to terminate the Agreement and its ongoing obligation to pay "rents" ceases. The risk of destruction of the property falls on the Agency. Agreement § 706.

It is also important to note that the rents were calculated based on the value of the land—not on the value of the improvements on the land. Debtor offers no evidence that calculating rent by way of applying a percentage return on the value of the land is inconsistent with a lease. It appears to be a logical method of calculating a reasonable rent. The court finds that the Agreement is not a disguised financing device under California law. The court's finding is primarily based on the facts that Debtor does not have the option to purchase the land during the course of the Agreement and that the land will have a substantial value at the time the Agreement terminates.

### 4. *The economic substance and terms of the Agreement are consistent with the definition of a lease under California Law.*

A lease is created in California where "one gives to another the temporary possession and use of property ... with an agreement that it shall be returned at a future time." Cal.Civ.Code § 1925 (West 1993). "[A] lease is nothing other than an instrument by which one is granted, upon stated terms and conditions, *a right to occupy a parcel of land to the exclusion of the grantor.*" *Bachenheimer v. Palm Springs Management Co.*, 116 Cal.App.2d 580, 581, 254 P.2d 153 (1953). Additionally, "[a] lease must include a definite description of the property leased and an agreement for rental to be paid at particular times during a specified term." *O'Shea v. Claude C. Wood Co.*, 97 Cal.App.3d 903, 909–10, 159 Cal.Rptr. 125, 128 (1979). The terms of the Agreement and the economic substance of the Agreement are consistent with a lease. The Agreement: includes a definite description of the property to be leased;[10] provides for periodic payment of rent for the term of the lease;[11] and contemplates that possession of the land will revert back to the Agency at the end of the term of the lease.[12] These factors are all common to leases.

The fact that the Agreement has a potential term of ninety-nine years does not remove the Agreement from the definition of a lease. *See, e.g., Bachenheimer*, 116 Cal. App.2d 580, 254 P.2d 153 (1953). *Bachenheimer* involved a lease with a term of ninety-nine years initially, that is without the need of the lessee to obtain extensions. In this case, the Agreement has an initial

---

10. Agreement § 104.

11. Agreement § 303.

12. Agreement § 1211.

term of only fifty years, it can be extended to ninety-nine years but only upon Debtor meeting the requirements for, and actually obtaining, five extensions.

The following terms in the Agreement, among others, are consistent with a lease:

(1) The Agency warrants that it owns the land free and clear of any encumbrances; [13]

(2) Rent is payable in monthly installments; [14]

(3) Only the value of the land, not the improvements, is considered in determining market rents; [15]

(4) Rent may be adjusted upward to reflect an increase in the value of the land; [16]

(5) Debtor is given the right to quiet enjoyment of the premises; [17]

(6) Debtor's rights to alter the improvements on the land are limited and generally require the consent of the Agency; [18]

(7) If the improvements are destroyed, Debtor has the right to terminate the Agreement and its obligation to pay ongoing rent ceases; [19] and

(8) The Agency retains ownership of the land and may encumber, assign, or otherwise transfer its interest in the land at any time during the period in which the Agreement is in effect.[20]

The court finds that under California law, the Agreement is what it purports to be—a lease.

### B. *Bankruptcy Law Does not Excuse Debtor's Performance Under § 365.*

#### 1. *Cases addressing § 365(d)(4) are inapplicable.*

Most of the cases cited by the parties concern the issue of whether § 365(d)(4) applies to the agreements in issue. *Moreggia,* 852 F.2d at 1179; *International Trade*

*Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744 (2d Cir.1991); *In re Wingspread Corp.,* 116 B.R. 915 (Bankr. S.D.N.Y.1990); *In re Tak Broadcasting Corp.,* 137 B.R. 728 (W.D.Wis.1992). In the above cases, the debtors had failed to assume agreements denominated leases within sixty days as required by § 365(d)(4) and the issue was simply whether they should have lost all the benefits they had under the agreements because the agreements were deemed rejected for failure to assume them within sixty days of filing bankruptcy. In these cases the court avoided the forfeiture caused automatically by § 365(d)(4) by holding that the leases were not the type of leases intended by Congress to be subject to § 365(d)(4).

"[T]he purpose of Section 365(d)(4) is to protect lessors from delay and uncertainty by forcing the trustee or debtor-in-possession to act quickly to assume unexpired leases." *Moreggia,* 852 F.2d at 1185 (citing *In re Southwest Aircraft Servs. Inc.,* 831 F.2d 848 (9th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988)). The basis of the *Moreggia, International Trade, Tak,* and *Wingspread* decisions was the courts' finding that the purpose of § 365(d)(4) would not have been furthered by applying the sixty-day deadline to the agreements. *Moreggia,* 852 F.2d at 1184 (purpose of preventing prejudice to lessors would not be served in a case in which all rents have been paid in advance); *International Trade,* 936 F.2d at 749 (same) *Tak,* 137 B.R. at 733 (focused on fact that rents were only $1 per year); *Wingspread,* 116 B.R. at 923 (focused on fact that rents were unrelated to the value of the leasehold).

The above decisions are inapplicable in this case because § 365(d)(4) is not in issue. Debtor was granted an extension of the time in which to assume the Agreement

---

**13.** Agreement § 110.

**14.** Agreement § 303.

**15.** Agreement § 304(ii).

**16.** Agreement §§ 304, 305.

**17.** Agreement § 507.

**18.** Agreement § 705.

**19.** Agreement § 706.

**20.** Agreement §§ 1313, 1314.

throughout the course of these proceedings. Moreover, rents are due under the Agreement for each month that it is in effect and do, in fact, relate to the value of the leasehold. The above authorities simply do not support Debtor's position that it has the ability to modify the rights of the Agency as set forth in the Agreement pursuant to a plan of reorganization.

### 2. Debtor must assume or reject the Agreement as a whole.

■ Section 365(b)(1) requires that the debtor-in-possession cure all past defaults and offer adequate assurance of future performance under the terms of the lease as a condition of assumption. *In re Pacific Express, Inc.,* 780 F.2d 1482 (9th Cir.1986). The only decisions holding that the entirety of § 365 does not apply to a document denominated a lease involve situations in which the economic substance of the agreements in issue were those of a joint venture or disguised security device. *See In re PCH Assocs.,* 804 F.2d 193 (2d Cir.1986); *International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744 (2d Cir.1991). As previously explained in its analysis of the Agreement under California law, the court finds that the economic substance of the Agreement is not that of a joint venture or financing arrangement.[21]

The facts of this case are similar to those underlying the *Port Angeles* decision.[22] In

*re Port Angeles Waterfront Assocs.,* 134 B.R. 377 (9th Cir. BAP 1991). In *Port Angeles,* the Ninth Circuit Bankruptcy Appellate Panel held that where the obligation to pay rent is executory and the contract is an unexpired lease under California law, the entirety of § 365 applies. Importantly, the court noted that "[t]here is *always* a forfeiture of the lease under § 365(d)(4) and ... there is no forfeiture exception under § 365(d)(4)." *Port Angeles,* 134 B.R. at 380.

Section 365 does not give debtors the ability to rewrite the terms of an unexpired lease. *Richmond Leasing Co. v. Capitol Bank N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Since Debtor has admitted that it does not have the ability to perform under the terms of the Agreement, it appears likely that the Agreement will be rejected. This may result in a windfall to the Agency. However, this forfeiture was contemplated by the Agreement, which was voluntarily entered into by Debtor, and the court is without the power to aid Debtor in renegotiating the terms of the Agreement. *In re Lansing Clarion Ltd. Partnership,* 132 B.R. 845 (W.D.Mich.1991); *In re Emory Property, Ltd.,* 106 B.R. 318 (Bankr. N.D.Ga.1989).

Under the terms of the Agreement, the potential forfeiture was substantial from

**21.** Moreover, both cases are factually distinguishable from this case. In *PCH Assocs.,* the Second Circuit Court of Appeals held that a transaction involving a sale-lease back was not a true lease, but was actually a financing arrangement or a partnership. The facts unique to the agreement at issue in *PCH Assocs.* included: 1) The purchase price paid for the land by the lessor was far in excess of the value of the land—it represented the amount necessary to finance the overall transaction which included development of a building on the land; and 2) The rent was not related to the value of possessing the land, but was instead calculated to repay the investment of the lessor with interest. *PCH Assocs.,* 804 F.2d at 196. In this case the evidence is uncontroverted that the Agency purchased the land for market value. Moreover, it is uncontroverted that the amounts denominated as "rents" under the terms of the Agreement are in fact related to the value of the land. In *International Trade,* the Second Circuit Court of Appeals held that the transaction in issue was a hybrid between a lease and a sale. The lease

in issue was for a ninety-nine year term and required a base rent in the total amount of $97,830 to be fully paid in three installments during the first three years of the lease. All base rent was paid prior to the filing of the petition. The *International Trade* case is similar to *Moreggia:* in both cases the debtors' obligation to pay ongoing rent had terminated before the filing of the bankruptcy petition. In both cases, the courts essentially held that even if they were deemed leases, they were not the type of leases intended by Congress to be covered by § 365 because the lessor had been fully paid for the use of the property. In this case, however, Debtor's obligation to pay rent is far from complete.

**22.** In his dissent, Judge Jones noted that the remaining rental obligations were not substantial when compared to the value of improvements forfeited by the Debtor. Here, however, the remaining obligations under the Agreement are substantial.

the first day that the Agreement became effective. Debtor was required to obtain financing for and construct a $50 million building on the land prior to the Agreement becoming effective. If Debtor failed to pay the amount denominated as "rents" under the terms of the Agreement, the Agency had the immediate right to demand that Debtor perform those obligations and, upon appropriate notice, had the right to terminate the Agreement if those obligations were not performed. Upon termination, occupation of the land and title to the building revert to the Agency. Agreement § 702.

The Agency was not obligated to negotiate the Second Amendment to the Agreement resulting in a five year period during which Debtor was able to forebear payment of its basic rental obligation. As explained in *Morta v. Korea Ins. Corp.,* 840 F.2d 1452 (9th Cir.1988): "It is a fundamental principle of contract law ... that '[w]ise or not, a deal is a deal.'" *Id.* at 1460 (quoting *United Food & Commercial Workers Union Local 770, 889, & 1442 v. Lucky Stores, Inc.,* 806 F.2d 1385, 1386 (9th Cir.1986)). "[T]he general rule of freedom of contract includes the freedom to make a bad bargain." *Sanger v. Yellow Cab. Co.,* 486 S.W.2d 477, 481 (Mo.1972), *quoted* in *Morta,* 840 F.2d at 1460; *see also United Food & Commercial Workers Union Local Nos. 770, 889, & 1442 v. Lucky Stores, Inc.,* 806 F.2d 1385 (9th Cir.1986).

## V. CONCLUSION.

The court finds that the Agreement is both a lease as defined under California law and a lease designed to be covered under § 365 of the Bankruptcy Code. The court hereby extends the date by which Debtor may assume or reject the Agreement to November 30, 1993.