Filed 2/5/21  Owens v. City and County of San Francisco CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PETER M. OWENS et al., Plaintiffs and Appellants, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents. | A157981 (City & County of San Francisco Super. Ct. No. CPF18516203) |

Appellants own a six-unit building in the city of San Francisco, which they seek to convert to condominium ownership.[1]  Respondent City and County of San Francisco (the City) denied their application on grounds including that they had recently displaced an elderly resident and had provided false information to the City.  Appellants then sought a writ of mandate in the trial court to overturn this decision, which the trial court denied.  We shall reverse the judgment.

---

[1] Appellants are Peter M. Owens, Stephen L. Owens, Carolyn A. Radisch, Geoffrey Pierce, Spencer K. Jones, Christopher Beahn, Christine Han Beahn, Alexander E. Apke, Anna M. Munoz, Michel Bechirian, and Niloo Tehranchi.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Peter M. Owens (Owens) bought the six-unit property on Page Street in San Francisco (the building) in August 2002, along with his wife, Carolyn A. Radisch, and brother, Stephen L. Owens (collectively, "the Owenses"). The next month, they gave the tenants in the four occupied units notice of intent to remove the building from rental use under the Ellis Act, which allows owners of residential property to remove property from the rental market consistent with certain guidelines. (*Danger Panda, LLC v. Launiu* (2017) 10 Cal.App.5th 502, 506–507; Gov. Code., § 7060 et seq.) By early 2003, the tenants in three of the units had moved out. Owens then renovated and sold five of the six units as tenancy-in-common (TIC) units.

The unit at the heart of the controversy before us was occupied by an elderly tenant, Iris Canada. In order to allow Canada to remain in her home, the Owenses entered into an agreement with her in 2005 under which they granted her a life estate in their interest in the apartment. Canada was represented by counsel in negotiating the agreement. The "Grant of Life Estate" provided that the estate was valid "[f]or the term of Iris Canada's natural life, for as long as she permanently resides, as the sole and only occupant in [her apartment]." The Owenses reserved the right to revoke the life estate if Canada failed to make payments or violated the terms of the accompanying deed of trust. Under the deed of trust, in turn, Canada agreed to keep the property in good condition and repair, to do "all . . . acts which from the character or use of said property may be reasonably necessary," including fumigating, and not to commit or permit waste. The Grant of Life Estate and deed of trust were recorded in October 2005. An amendment to the TIC agreement for the building provided that if Canada violated the terms of the deed of trust, promissory note, or life estate deed, the Owenses

2

would "take all necessary actions to revoke Iris Canada's Life Estate and remove Iris Canada."

A bill of sale provided that the Owenses, "in consideration of the promises, covenants, conditions and agreements of Iris Canada ('Purchaser'), and in exchange for monetary consideration in the amount of $250,000 (via execution of a Promissory Note in the amount of $250,000 of even[] date herewith), do hereby grant, bargain, sell, transfer, convey, assign and deliver to Purchaser a Life Estate equivalent to a 16 2/3 interest in [the building], specifically occupancy in the unit known as [Canada's apartment]." The promissory note required Canada to make payments on the $250,000 at the rate of $700 per month, with any remaining indebtedness cancelled after 250 months or upon her death, whichever occurred first.

As Canada grew older, it became more difficult for her to care for herself safely, and, beginning in 2012 when she was 96 years old, family members mostly cared for her in their homes. From 2014 onward, she spent much of her time at the home of her great-niece Iris Merriouns. She also spent time with other relatives in Texas and Los Angeles. During the ensuing years, according to Merriouns, Canada went to the apartment on occasion, but did not stay alone there.

Appellants submitted evidence that until 2012, they saw Canada in the building regularly and assisted her with bringing in her mail and other neighborly tasks. Two of the residents checked on Canada in June 2012 when they realized they had not seen her for several days. She did not respond when they knocked and used the door buzzer, so they used an emergency key to enter her apartment. Canada was not present, and the residents saw rotting food, trash, roaches, and dead and dying vermin caught in traps. Cleaners and exterminators arrived in mid-July 2012, and they

3

removed multiple sacks of refuse. Merriouns told Owens that she had seen the apartment was overrun with roaches and vermin and that she had moved Canada out of the apartment until she could arrange for it to be professionally exterminated and cleaned.

After this time, the other residents saw Canada only rarely, when she would come to the building with Merriouns, stay for a few hours, and leave, not to be seen again for several months. In the ensuing years, packages were sometimes left outside her door for long periods of time. Over a period of more than a month beginning in December 2014, a smoke detector sounded inside Canada's unit every minute around the clock. A resident of the unit adjacent to Canada's, Geoffrey Pierce, declared that the two units shared an 80-foot common wall. Before the summer of 2012, he saw Canada three or four times a week, and he heard typical residential sounds from her unit, such as people walking, television, alarm clocks, and talking. Beginning in the summer of 2012, neither he nor his wife heard such sounds. The same lights in Canada's unit were on for months at a time, with no adjustment or change, and if a light went out, it would be out for months. The furnace heating Canada's apartment was no longer on. Canada's food deliveries from Meals on Wheels ceased, there was no indication she was receiving mail regularly, and no one was seen removing garbage or recycling from the unit thereafter. All of Canada's payments for her life estate from fall 2012 onward arrived with an Oakland postmark.

Owens stated in a declaration that he was present at a City inspection in May 2014, during the course of which he entered Canada's apartment. He saw that all of the water in the toilet bowl had evaporated, leaving it "bone dry"; the bathtub had mold in it; rodent and roach traps lined the walls of the apartment, almost all of the furniture was stacked in the center of the back

4

rooms, and the beds were covered with bags of old clothes; the refrigerator was empty save for cans of soda; there was vermin excrement on top of the tables and shelves in the kitchen; large piles of trash blocked the back door; there were rolls of urine-soaked and feces-infested carpeting; the entire apartment was permeated with a "very strong and horrendous" smell; the calendar in the kitchen displayed the month July 2012; and a 2013 holiday card from Christopher Beahn was unopened on the front hall bookcase. Owens concluded the apartment was "unlived in and unlivable."[2]  He contacted Merriouns to ask about Canada, and he met with both Merriouns and Canada in Oakland on May 31, 2014.  Canada looked well, and Merriouns told Owens that Canada had been living with her in Oakland since 2012.

In 2014, appellants applied to subdivide the building into condominium units under the City's Expedited Conversion Program found in section 1396.4 of the San Francisco Subdivision Code (the Subdivision Code or Subd. Code), which allowed condominium conversion for six-unit buildings if certain conditions were met.[3]  The application listed Canada's unit as vacant. Because the title report showed Canada as an owner of record, the City advised appellants that Canada's signature was needed for the application. Owens attempted to contact Canada and obtain her signature on the

---

[2] Another resident saw similar conditions in January 2015.

[3] We grant appellants' request for judicial notice, filed February 21, 2020, as to exhibits A, B, C, E, F, G, and H, portions of San Francisco's Charter, Administrative Code and Subdivision Code.  We deny the request as to Exhibit D, an appellate brief filed by the City and the San Francisco Tenants Union in unrelated litigation in 2003.  We grant appellants' request for judicial notice of San Francisco Ordinance No. 117-13, filed October 8, 2020.

5

necessary documents, to no avail. By October 2014, the other TIC owners told Owens that if the documents were not signed, they would compel him under the TIC agreement to initiate revocation of Canada's life estate.

In November 2014, the Owenses sent Canada a notice of default of her obligations under the Grant of Life Estate and deed of trust, and in December 2014 they filed an action against Canada in the San Francisco County Superior Court (the "earlier litigation") alleging that Canada had violated the terms of the life estate deed and deed of trust by failing to keep her unit in good condition and repair, that she had committed waste, and that she no longer resided permanently in her apartment. They sought a declaration that "any estate or tenancy currently held by [Canada] has ended as a result of her failure to satisfy a condition of her grant and Life Estate Deed" and that they were entitled to possession of the apartment, as well as recovery of possession, injunctive relief, damages, and foreclosure of the deed of trust.

The trial court granted summary judgment to the Owenses in March 2016, finding there was no triable issue as to a number of facts, among them that Canada failed to permanently reside in her apartment as the sole and only occupant; that she failed to keep the apartment in good condition and repair; that she committed or permitted waste; and that her life estate was revoked. The court awarded the Owenses possession of the apartment, foreclosed the deed of trust, terminated Canada's life estate, and entered judgment accordingly.

Canada moved for relief from forfeiture (Civ. Code, § 3275), and in April 2016 the trial court granted the motion, on condition that she make full compensation to the plaintiffs, pay their attorney fees, and honor all her obligations under the promissory note, deed of trust, and life estate. At the hearing on the motion, the Owenses offered to give up their right to attorney

6

fees and costs in exchange for Canada's signatures on the paperwork necessary to convert the building to condominiums, and they raised no objection to the trial court reinstating her life estate and allowing Canada to live in the unit under the original terms and to have a live-in caregiver, as long as an agreement could be reached that would prevent a caregiver from later asserting a right to possession as a tenant under the City's rent ordinance. They reiterated their offer on June 30, 2016, with greater specificity, in a letter to Canada, including an offer to "work with Iris Canada and her family to make any reasonable accommodation to help Iris Canada age in place so long [as] it does not jeopardize their ownership rights [upon her death], however Iris Canada remains precluded from permitting any tenancies to be established at [the apartment]." Canada did not accept the settlement proposal. She and Merriouns did, however, extend their visits to the apartment in 2016, sometimes staying for a couple of days at a time leading up to a court hearing.

After the trial court set the amount of attorney fees and costs, Canada appealed and filed a petition in this court for a writ of supersedeas. (*Canada v. Superior Court* (Nov. 19, 2019, A149169) app. dism.)[4] This division initially stayed execution of the writ of possession pending resolution of the petition for writ of supersedeas, and on December 29, 2016 denied writ relief and dissolved the stay. On February 10, 2017, Canada's belongings were removed from the unit by a San Francisco County Sheriff and the locks were changed.

---

[4] Canada's counsel later informed the court that Canada died on March 27, 2017, and the appeal was dismissed. We take judicial notice of the documents filed in case No. A149169.

7

Appellants submitted a renewed condominium conversion application in September 2017, listing Canada's unit as vacant from November 2012 through January 2017. The conversion was opposed by a number of people and groups, including housing rights advocates and senior advocates. Some of them testified that Canada hosted a party for her hundredth birthday at the apartment in 2016, and that they visited her there in 2016.

The City's Planning Commission disapproved the condominium conversion, concluding it violated the City's Subdivision Code in four respects: "(i) vacancies in the project have been increased, (ii) an elderly tenant has been displaced from her unit within three years preceding the application date . . . , (iii) an eviction or its equivalent occurred for purposes of preparing the building for conversions, and (iv) the sub[]divider has knowingly submitted incorrect information [about whether the unit was occupied] that misled and misdirected efforts by agencies of the City in the administration of the Subdivision Code."

Appellants appealed the denial to the City's Board of Supervisors, which denied the appeal.

Appellants then brought the present action in the trial court, seeking declaratory relief and a writ of mandate compelling the City to approve their application to convert the building to condominiums. The trial court denied the petition, finding there was substantial evidence to support the Planning Commission's findings that Canada was a tenant, as defined by Subdivision Code section 1308, subdivision (j), who was displaced from the property and that incorrect information was knowingly submitted during the application process. The court rejected appellants' arguments that the Ellis Act preempted the finding that Canada was a tenant, that the City was estopped from taking the position that Canada was a tenant rather than an owner for

8

purposes of the conversion, and that they were deprived of equal protection. This timely appeal ensued.

## DISCUSSION

### I. Legal Principles

California law authorizes cities to adopt ordinances to regulate and control the subdivision of real property, including the conversion of apartments to condominiums, as long as the ordinances do not conflict with state law. (Gov. Code, § 66411; *Griffin Development Co. v. City of Oxnard* (1985) 39 Cal.3d 256, 261–262.) The City's relevant ordinances are found in the Subdivision Code.

At the time appellants applied to convert the property, the City had an expedited condominium conversion program applicable to, as relevant here, "buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously by the applicant owners of record for no less than five years as of April 15, 2013." (Subd. Code, § 1396.4, subd. (b)(1).) An application for conversion under the expedited program required the applicants to certify that any non-purchasing tenants in the building had been offered a lifetime lease, to expire upon the death of the life tenant or the last surviving member of the life tenant's household, "provided such surviving member is related to the life-tenant by blood, marriage, or domestic partnership, and is either disabled, catastrophically ill, or aged 62 or older at the time of death or demise of any such life-tenant, or at such time as the life-tenant(s) in the unit voluntarily vacates the unit after giving due notice of such intent to vacate." (*Id.*, subd. (g).)

The City's Planning Commission (the Commission) must disapprove an application for a tentative map under specified circumstances, including when it "determines that vacancies in the project have been increased, or

9

elderly or permanently disabled tenants displaced or discriminated against in leasing units, or evictions have occurred for the purpose of preparing the building for conversion, or if rents in the project over the previous 18 months preceding the date of filing the application have been increased substantially . . . , or when the City Planning Commission determines that the subdivider has knowingly submitted incorrect information (to mislead or misdirect efforts by agencies of the City and County of San Francisco in the administration of this Code)." (Subd. Code, § 1386.) In that event, the subdivider may not reapply for 18 months after denial of the application. (*Ibid*.) In evaluating the displacement of elderly tenants, "any such displacements over the preceding three years, and the reasons therefor, shall be considered." (*Ibid*.)

On appeal, we review the administrative decision, not the decision of the trial court. (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 418–419 (*Young*).) Our role is " 'to consider whether the administrative agency committed a prejudicial abuse of discretion by examining whether the findings support the agency's decision and whether substantial evidence supports the findings in light of the whole record,' " and we reverse the agency's decision " 'only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' " (*Id*. at p. 419.)

In considering the meaning of an ordinance, we apply "our independent review, with deference given to the agency's interpretation." (*Besaro Mobile Home Park, LLC v. City of Fremont* (2012) 204 Cal.App.4th 345, 354.) Whether deference to the agency's interpretation is appropriate and, if so, to what extent depends on context. An agency's interpretation may be "helpful, enlightening, even convincing," or "of little worth," depending on factors such as whether the agency has expertise and technical knowledge relevant to the

10

interpretive issue at hand, whether its interpretation reflects careful consideration by senior agency officials or public participation through the notice and comment procedures of the Administrative Procedure Act, and whether the interpretation was adopted contemporaneously with enactment of the ordinance and has been consistently maintained over time. (*Yamaha Corp. of America v. State Bd. Of Equalization* (1998) 19 Cal.4th 1, 8, 12–13.) The ultimate interpretation of an ordinance is for the court. (*Id.* at p. 13.)

## II. Was Canada a Tenant?

The question before us is whether the City properly concluded that appellants were ineligible to convert the building to condominiums because they fell within one of the exceptions to the expedited conversion program. If any one of the exceptions applies, the Commission was required to deny their application. (Subd. Code, § 1386.)

We focus first on the finding that Canada was an "elderly tenant" who was "displaced" for purposes of Subdivision Code section 1386. Appellants contend this clause does not apply because Canada was not a tenant, but rather the owner of a life estate.

The Subdivision Code defines a " '[t]enant' " expansively—as "a person or persons entitled under a lease, rental agreement *or other agreement* with the owner of record of the property or his or her agent *to occupy a dwelling unit.* A 'tenant' can be an owner or a shareholder of the owner of record who resides in the property." (Subd. Code, § 1308, subd. (j), italics added.) The City argues Canada was a tenant under these standards, because her life estate was an "agreement with the [Owenses] . . . to occupy a dwelling unit."

The question we face is whether a "life estate" interest is inconsistent with a tenancy as defined by the Subdivision Code. We are mindful that in interpreting the agreement between Canada and the Owenses, we properly

11

"look[] through form to substance." (*Bachenheimer v. Palm Springs Management Corp.* (1953) 116 Cal.App.2d 580, 593 [lease agreement purporting to allow construction and maintenance of building for 99 years without lease of underlying land was in effect a lease of the real property]; see *In re SCCC Assocs. II Ltd. Partnership* (N.D.Bankr. 1993) 158 B.R. 1004, 1009 ["Although denominated a lease, an agreement which does not establish a landlord-tenant relationship is not a lease"], citing *Moss v. Williams* (1948) 84 Cal.App.2d 830, 835.)

Under California law, the interest conveyed by a life estate is broad. Civil Code section 818 provides, "The owner of a life estate may use the land in the same manner as the owner of a fee simple, except that he must do no act to the injury of the inheritance." (Accord, *Faus v. City of Los Angeles* (1967) 67 Cal.2d 350, 362, fn. 9 ["a life tenant . . . enjoys a right to the use of the property which is restricted only by the rules against waste"]; *Durante v. County of Santa Clara* (2018) 29 Cal.App.5th 839, 842 (*Durante*) ["a life estate in real property is considered an interest in fee simple"].) "[I]njury to the inheritance," for purposes of Civil Code section 818, known at common law as waste, requires " ' "acts which injuriously affect the market value of the property." ' " (*Smith v. Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 775–776; accord, *Old Republic Ins. Co. v. Superior Court* (1998) 66 Cal.App.4th 128, 149, overruled on other grounds in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 841, fn. 13 (*Vandenberg*).)

The "Grant of Life Estate" to Canada was subject to terms that strictly limited the estate granted. Specifically, the estate was for the term of Canada's life "for as long as she permanently resides, as the sole and only occupant" of her apartment. And the grant contained further limitations; expressly excepted were, "Iris Canada's right to rent, lease or sublet the

12

[apartment] and/or Iris Canada's right to have any other occupants living with Iris Canada at [the apartment], and the right of Iris Canada to assign, transfer, pledge or encumber her interest in the property so as to secure any financial arrangement other than to [the Owenses]." The grant also reserved to the Owenses (a) the right to revoke the life estate if Canada failed to make her monthly payments or violated the terms of the deed of trust, (b) the right to refinance the property, and (c) the obligation to pay property taxes. Any revocation under the terms of the grant deed was required to be made in writing and recorded.

The estate granted subject to these limitations bears scant resemblance to the rights associated with fee simple ownership. (See Civ. Code, § 818.) Rather, Canada's "estate" was limited to the right to live alone in the apartment as long as she paid a monthly amount roughly equivalent to her previous rent obligation. Whatever name the parties might have given it, we agree that the City could properly treat the grant of this life estate as an agreement other than a lease or a rental agreement "to occupy a dwelling unit," giving rise to a tenancy relationship for purposes of the Subdivision Code. (Subd. Code, § 1308, subd. (j).)

For their argument that the definition of tenant does not encompass Canada, appellants point to the sentence in the definition that states, "A 'tenant' can be an owner or a shareholder of the owner of record *who resides in the property*." (Subd. Code, § 1308, subd. (j), italics added.) They contend this sentence means that only owners who reside at the property—as Canada did not—fall within the definition. Further they argue, the inclusion of owners in the definition applies only in the narrow context—not at issue here—of ensuring owners in TIC arrangements could qualify for conversion. We are not persuaded, however, that the quoted language acts to limit the

13

provision that a tenant is a person entitled to occupy a unit under a lease, rental agreement, or other agreement with the owner of record. (*Ibid*.) Having found, based on the first sentence of the definition of "tenant" that Canada was a tenant for the purposes of the subdivision code, we have no occasion to construe or apply the language in the second sentence, which is specific to an "owner." (Subd. Code, § 1308, subd. (j).)

Appellants' reliance on *Durante, supra,* 29 Cal.App.5th 839 does not persuade us otherwise. The question before the court there was whether the transfer of a life estate in a 50 percent interest in a house from one sister to another—where the sisters had previously held title as tenants in common— was a change of ownership for purposes of property tax assessment. (*Id*. at pp. 841–842.) The court concluded that the transfer of a life estate in a cotenant's interest qualified as a "change in ownership" as defined by Revenue and Taxation Code section 60, which defines the term as " 'a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest.' " (*Durante*, at pp. 842–843.) The transfer fell within this definition because the transferor had previously had an equal right to beneficial use of the house, and she relinquished her right to use the property, thus "giving plaintiff full ownership of the property and exclusive possession for life." (*Id*. at pp. 843–844.)

*Durante* does not stand for the proposition that any transfer of an interest denominated a life estate creates a fee simple interest in real property that is inconsistent with a tenancy. Rather, the court carefully looked to the statutory definition at issue and the facts before it to determine the nature of the transfer. Definitions of property in the Revenue and Taxation Code prevail for tax purposes even where they are inconsistent with

14

common law definitions codified in Civil Code. (See *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 163, fn. 3.) *Durante*'s discussion of the tax treatment of a life estate thus has little or no bearing on whether the interest denominated a "life estate" in Canada's agreement with the Owenses is inconsistent with the Subdivision Code classifying Canada as a tenant.

Here—even without deferring to the City's interpretation of the ordinance—we conclude the broad definition of tenant in the Subdivision Code and the practical limitations placed on Canada's enjoyment of the apartment indicate that Canada was a tenant for the purposes relevant to the City's decision.

Appellants suggest treating Canada as a tenant would lead to absurd results because the Subdivision Code includes tenant protections that do not apply to owners of units being converted. For example, the code contains provisions limiting rent increases for tenants relocated during a conversion (Subd. Code, § 1390), requires 120-day eviction notices (*id.*, § 1392) and temporary relocation payments (*id.*, § 1389), and gives a present tenant the right to purchase a converted unit (*id.*, § 1387). Appellants' argument proves too much, since the definition of tenant expressly contemplates that some owners may fall within it. (*Id.*, § 1308, subd. (j).) We need not decide here the scope of the tenant protections that apply to owners who fall within that definition. We merely conclude that, on the facts before it, the City properly treated Canada as a tenant for purposes of section 1386 of the Subdivision Code.

## III. Was Canada Displaced?

Appellants argue that even if Canada was a tenant for purposes of the condominium conversion provisions of the Subdivision Code, she was not

15

"displaced" because the evidence shows that from 2012 on, she lived not in her apartment but with family members outside San Francisco. On this point, we agree with appellants.

The Subdivision Code does not define the term "displace." (See Subd. Code, § 1308.) The dictionary definition of the word is "to remove from the usual or proper place" or "to move physically out of position." (Merriam-Webster.com <https://merriam-webster.com/dictionary/displace> [as of Feb. 5, 2021].)

The evidence here shows unambiguously that beginning in 2012 Canada was no longer able to live alone safely, that her relatives cared for her in their homes, and that she was physically present at her apartment only sporadically and for short times. The City argues there is substantial evidence she continued to occupy her apartment after 2012, but none of it shows more than that she kept furniture and other belongings there, that she visited it occasionally, and that in 2016—apparently after the apartment had been cleaned—she on occasion stayed overnight and entertained visitors there. The City points to Merriouns's declaration that Canada had no other home than the apartment; to statements made at hearings that Canada voted in San Francisco in 2014, held a party for her hundredth birthday in the apartment in 2016 when it looked as though she lived there, and received visitors at the apartment in 2016; and to the fact that the Owenses continued to accept her monthly payments. But nothing suggests Canada herself occupied the apartment on a regular basis, and we cannot ignore the overwhelming evidence—including Merriouns's own deposition testimony—that she did not do so.

The question remains whether the City could properly conclude these facts mean Canada was "displaced" in a manner that supports denying

16

appellants' conversion application under Subdivision Code section 1386. The City acknowledged at oral argument that the purpose of the pertinent ordinances is to protect elderly occupants of San Francisco apartments, and that if Canada in fact resided elsewhere, she would not be entitled to these protections. This position is consistent with the expressed purposes of the Subdivision Code, which include "[t]o prevent the displacement of elderly and disabled tenants by assuring them of extended leases *to remain in their units* subsequent to conversion." (Subd. Code, § 1302, subd. (c)(4), italics added.) It is true that Canada kept furnishings and belongings in the apartment and visited there from time to time, and that after her belongings were removed and the locks changed, Canada no longer could make any such use of the apartment. But in light of this statutory purpose, we cannot say that the removal of Canada's belongings indicates Canada *herself* was displaced; Canada was not "remove[d] from [her] usual . . . place" or "move[d] physically out of position." (Merriam-Webster.com <https://merriam-webster.com/dictionary/displace> [as of Feb. 5, 2021].) Her usual place after 2012 was not at the apartment, but in the home of her great-niece and other family members. Accordingly, we conclude substantial evidence in light of the whole record does not support the finding that Canada was displaced for purposes of Subdivision 1386. (See *Young, supra*, 10 Cal.App.5th at p. 419.)

## IV.    Evictions and Vacancies

As a separate basis for the denial, the City found that "an eviction or its equivalent occurred for purposes of preparing the building for conversions." (Subd. Code, § 1386.) Appellants argue this finding is unsupported. The City points to the evidence that the Owenses were motivated at least in part by a desire to convert the building to condominiums when they sought to revoke Canada's life estate; indeed, even after prevailing in the earlier litigation,

17

they offered to allow her to live in the apartment with a caretaker for the rest of her life if she would sign the documents allowing the conversion.

The City's evidence is not sufficient to support its finding. First, this evidence shows that appellants sought to pursue their application while *allowing* Canada to retain her interest in the apartment and that Canada refused their efforts. Second, the bases upon which the court returned possession of the apartment to the Owenses—that Canada failed to reside at the apartment and that she committed waste—were independent of any effort to convert the building to condominium usage. Finally, as we have explained, the relevant ordinances are intended to protect the elderly who are "in their units" (Subd. Code, § 1302, subd. (c)(4)), and Canada did not reside regularly in her unit after 2012. In these circumstances, the evidence does not support the finding that Canada was evicted in order to prepare the building for condominium conversion.

As to the City's finding that vacancies at the property had increased, the City acknowledges that this finding is based on the findings that Canada had been displaced or evicted. We have concluded that she was not displaced or evicted for purposes of the ordinances at issue, and accordingly reject this additional finding.

## V. Incorrect Information

The City's final basis for denying the conversion application was that in their application appellants gave the City incorrect information. The Commission's findings recited that an unrelated application for discretionary review filed with the Planning Department on July 2, 2014 by the occupant of one of the units in the building specifically mentioned Canada as the current occupant of her apartment. This information, the Commission concluded, "is inconsistent with the building history listed on 'Form 1' of the subdivider's

18

application to the Department of Public Works, which states that [Canada's apartment] was 'vacant' from November 2012–January 2017." Thus, "the subdivider has knowingly submitted incorrect information that mis[led] and misdirected efforts by agencies of the City in the administration of the Subdivision Code.

The discretionary review application referred to in these findings was made by appellant Michel Bechirian in July 2014 in opposition to an unrelated construction project at an adjacent property. He asserted that project, as proposed, would be too close to the property line and would interfere with light and privacy in the building on Page Street about which he stated: "The lower unit . . . is occupied by Mrs. Iris Canada a 97 year old who has lived in the building since the 1940's. Even with a setback the amount of light filtering down to her apartment will be minimal." This statement, the City argues, is inconsistent with the initial conversion application submitted in April 2014, which described Canada's unit as vacant since July 2012, as well as with the operative 2017 application asserting the unit was vacant from July 2012 until January 2017. Both applications were signed by all applicants, including Bechirian.

While the City could reasonably view these assertions as inconsistent one with the other, we do not view any inconsistency as sufficient to support denying the 2017 application under section 1386 of the Subdivision Code. This section authorizes denial where "the subdivider has knowingly submitted incorrect information (to mislead or misdirect efforts by agencies of the City and County of San Francisco in the administration of this Code)." Whether or not Bechirian believed his July 2014 statement in opposition to

19

the unrelated project to be true,[5] the evidence relevant to the application at issue *here* shows unambiguously that Canada was physically present in her apartment only occasionally after July 2012. Just as there is no substantial evidence she occupied the apartment for purposes of the displacement, eviction, and vacancy clauses, the application's statement that the unit had been vacant since 2012 is insufficient to support a finding that appellants knowingly submitted incorrect information. The attorney who prepared the condominium conversion application said that it was his practice—and, he believed, the accepted and preferred practice at the Department of Public Works—to describe an apartment in which no one was residing as vacant, without regard to whether personal items or furniture remained in the apartment. Also, appellants were open with the staff planner assigned to evaluate their application about the foreclosure of Canada's life estate, pursuant to a court decision that was premised in part on Canada not having lived in the apartment since 2012. Reasonable minds might differ on whether "vacant" was the best description of the facts as appellants knew them, and because of this ambiguity in terms we find insufficient evidence to support the Planning Commission's finding that appellants provided information they knew to be false in order to mislead or misdirect the City.

## VI. Summary

We thus conclude the evidence does not support the City's findings on any of the four grounds upon which it relied, which means the City abused its discretion in denying the condominium conversion application.

Appellants make additional arguments: that the Ellis Act preempts the City's finding that Canada was a tenant, that the City was estopped to

---

[5] Bechirian explained to the City that when he objected to the project in July 2014, he did not realize Canada would not return to her apartment.

treat Canada as a tenant, and that the City violated their right to equal protection under the constitutions of the United States and California by impermissibly treating them as a " 'class of one' " rather than approving their application in a routine manner.  Because we reverse the judgment on the ground the evidence does not support the City's findings, we need not reach these alternate arguments.

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court (1) to grant a writ of mandate directing the City to set aside its denial and approve the application and (2) to conduct any other proceedings consistent with the views expressed herein.  Appellants shall recover their costs on appeal.


TUCHER, J.


WE CONCUR:

POLLAK, P. J.
BROWN, J.


*Owens v. City & County of San Francisco* (A157981)

21